John A. Azzarello
WHIPPLE AZZARELLO, LLC
161 Madison Avenue
Suite 325
Morristown, NJ 07960
Tel: (973) 267-7300

Serena P. Hallowell (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice* forthcoming)
Corban S. Rhodes (*pro hac vice* forthcoming)
Eric D. Gottlieb (*pro hac vice* forthcoming)
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: (212) 907-0700

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WCM ALTERNATIVES: EVENT-DRIVEN FUND; WCM MASTER TRUST; THE MERGER FUND; THE MERGER FUND VL; and JNL/WESTCHESTER CAPITAL EVENT DRIVEN FUND,<br><br>          Plaintiffs,<br><br>   v.<br><br>PERRIGO CO., PLC, JOSEPH PAPA, and JUDY BROWN,<br><br>          Defendants. | Civil Action No.<br><br>Judge:<br><br><br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

## TABLE OF CONTENTS

I.  SUMMARY OF THE ACTION ................................................................. 2

II.  JURISDICTION AND VENUE ............................................................ 11

III.  PARTIES AND RELEVANT NON-PARTIES ..................................... 11

    A.  Plaintiffs ........................................................................................... 11

    B.  Defendants ......................................................................................... 13

IV.  DEFENDANTS' FRAUDULENT SCHEME ......................................... 14

    A.  Perrigo Experiences Rapid Corporate Growth Through Acquisition .................. 14

    B.  Perrigo Makes Its Largest Acquisition Ever and Quickly Experiences Major, Known Integration Issues ................................................ 18

    C.  Perrigo's Organic Growth Slows Considerably Just Before the Relevant Period ................................................................................. 31

    D.  Perrigo's Generic Rx Results Were Boosted by Anti-competitive Practices And Not Insulated From Pricing Pressures ........................... 35

        1.  Desonide ................................................................................ 39

        2.  Econazole .............................................................................. 43

        3.  Permethrin ............................................................................. 45

        4.  Tretinoin ................................................................................ 48

        5.  Clobetasol ............................................................................. 50

        6.  Halobetasol propionate ......................................................... 51

    E.  To Fend Off Hostile Bid from Mylan, Defendants Inflate Growth Projections .................................................................................. 53

    F.  Defendants Hide Billions of Dollars of Deterioration in Perrigo's Largest Financial Asset by Violating GAAP ........................... 63

        1.  Applicable GAAP Requirements ........................................... 63

        2.  Defendants' Accounting Admittedly Violated GAAP ............ 65

        3.  Defendants' Used GAAP Violations to Hide Billions of Dollars of Deterioration in Fair Value ................................... 67

V.   MISREPRESENTATIONS AND OMISSIONS MADE BY DEFENDANTS
     DURING THE RELEVANT PERIOD.................................................................. 69

     A.   Omega Integration and Overvaluation ................................................. 69

     B.   Inflated Organic Growth Claims........................................................... 77

     C.   Pricing Pressure and Anti-Competitive Pricing Practices in Generic Rx
          Division ................................................................................................ 93

     D.   Declining Fair Value of Tysabri Royalty Stream ............................... 104

VI.  THE TRUTH IS REVEALED ..................................................................... 108

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ...................................... 118

     A.   Omega and Organic Growth .............................................................. 119

          1.   Defendants' own statements regarding the integration and
               valuation of Omega and organic growth imply personal knowledge
               of the true conditions .............................................................. 119

          2.   Information supplied by former employees of Perrigo and Omega
               demonstrate Defendants' scienter ........................................... 123

     B.   Generic Pricing and Anti-competitive Conduct................................. 124

     C.   Tysabri ............................................................................................... 126

     D.   Further Allegations of Scienter ......................................................... 127

          1.   Findings by the Irish Takeover Panel ..................................... 127

          2.   The sheer size of Defendants' misrepresentations and the GAAP
               violations ................................................................................. 128

          3.   The close proximity, and sharp divergence, between the
               misrepresentations and revelations of the truth ..................... 128

          4.   Sarbanes-Oxley Certifications ................................................. 129

          5.   Timing and circumstances of executive departures ................. 130

          6.   Defendants' Motives ................................................................ 130

VIII. RELIANCE................................................................................................ 131

IX.  NO SAFE HARBOR ................................................................................. 135

COUNT  I For Violations of Section 10(b) of the Exchange Act (Against All
Defendants) ........................................................................................................... 135

COUNT  II For Violations of Section 14(e) of the Exchange Act (Against All
Defendants) ........................................................................................................... 137

COUNT  III For Violations of Section 20(a) of the Exchange Act (Against Papa
and Brown) ............................................................................................................. 138

PRAYER FOR RELIEF ......................................................................................... 141

JURY DEMAND ..................................................................................................... 141

Plaintiffs, WCM Alternatives: Event-Driven Fund ("EDF"); WCM Master Trust ("MT"); The Merger Fund ("TMF"); The Merger Fund VL ("TMF VL"); and JNL/Westchester Capital Event Driven Fund ("JNL," and collectively with EDF, MT, TMF, and TMF VL, "Plaintiffs" or the "Westchester Funds"),[1] purchasers of the common stock of Perrigo Co., plc ("Perrigo" or the "Company") between April 21, 2015, and May 3, 2017, both dates inclusive (the "Relevant Period"), and owners of Perrigo common stock as of November 13, 2015 as alleged below, bring this action (the "Action") seeking to recover damages caused by defendants' violations of securities laws against Perrigo; Joseph C. Papa ("Papa"), Perrigo's former Chief Executive Officer ("CEO"); and Judy L. Brown ("Brown"), Perrigo's former Chief Financial Officer ("CFO") (collectively, "Defendants").

Plaintiffs allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon investigation of counsel, including, among other things: (i) review and analysis of public filings made by Perrigo with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of documents filed by Mylan, N.V. ("Mylan") with the SEC in connection with its tender offer for Perrigo; (iii) review and analysis of documents filed by Perrigo and Mylan with the Irish Takeover Panel in connection with Mylan's tender offer for Perrigo; (iv) review and analysis of press releases and other publications disseminated by Defendants; (v) review and analysis of news articles and conference call transcripts; (vi) review and analysis of other court filings related to Perrigo and Mylan, including the amended complaint for violation of the federal securities laws in *Roofers' Pension Fund v. Perrigo Co., plc*, No. 2:16-cv-02805-MCA-LDW (D.N.J.) and pleadings in *In*

---

[1] L. Civ. R. 10.1 Statement: The main office of Plaintiffs is located at: 100 Summit Lake Drive, Valhalla, NY 10595.

*re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724, Civil Action No. 2:16-md-02724-CMR (E.D. Pa.); (vii) review and analysis of other publicly available information concerning Perrigo and Mylan; (viii) analysis of pricing in the generic drug markets in which Perrigo operated; (ix) analysis of Perrigo's organic revenue growth; (x) review and analysis of other publicly available information; and (xi) information obtained from interviews with knowledgeable individuals. The investigation of facts pertaining to this case is ongoing. Plaintiffs believe that additional evidence will support the allegations herein after a reasonable opportunity for discovery.

I.    **SUMMARY OF THE ACTION**

1.       This action arises from misrepresentations and omissions that Defendants made to Plaintiffs while fighting a hostile takeover and throughout the Relevant Period (between April 21, 2015, and May 3, 2017). On April 8, 2015, pharmaceutical conglomerate Mylan announced an unsolicited bid to purchase Perrigo for cash and stock worth $205 per share (later increased to $246 per share). After twice increasing its bid, Mylan proceeded with a formal tender offer, which was announced on September 14, 2015. To discourage Perrigo shareholders from accepting Mylan's offer, Defendants repeatedly made material misrepresentations and omissions about four key areas: (a) the integration and overvaluation of Perrigo's largest acquisition, Omega Pharma N.V. ("Omega"); (b) Perrigo's organic growth; (c) collusive pricing and pricing pressure in Perrigo's most profitable division, generic drugs (which Perrigo called "Generic Rx" or sometimes just "Rx"); and (d) the deteriorating value of Perrigo's largest financial asset, a royalty stream for the drug Tysabri.

2.       To fight Mylan's offer, Defendants touted and spoke at length regarding the integration and prospects of Omega, making false and misleading statements and omissions regarding the status of the integration and the key role Omega would play in Perrigo's growth.

Following the expiration of Mylan's tender offer, as alleged below (*e.g.*, at ¶¶228-29, 233, 241), Perrigo effectively conceded that Defendants had misrepresented Omega's integration and prospects. The concealed problems with Omega were so profound that the Company ultimately took impairment charges totaling more than $2 billion, or nearly half of the total purchase price for Omega.

3.      Further, and as demonstrated through the accounts of numerous former employees of Perrigo and Omega (among other sources) detailed below, Defendants touted synergies with Omega as central to Perrigo's growth claims, even though Defendants knew or recklessly disregarded that there were deep problems with the Omega integration and the underlying assets, including: (a) a decentralized structure, disparate information technologies ("IT") and management resistance at Omega that made integration difficult; (b) regulatory hurdles to achieving claimed synergies; and (c) weak Omega sales. For example, according to a former Director of Marketing at Perrigo from prior to the beginning of the Relevant Period until April 2017 ("Confidential Witness 1" or "CW1") who was interviewed in the course of drafting this complaint, it was clear almost immediately after the Omega deal closed on March 30, 2015 that Omega was substantially underperforming, the integration had stalled and was marred by pervasive problems, and the synergies and growth projections touted by Perrigo and its executives, including Papa and Brown, were an illusion.

4.      Additionally, understanding that organic growth was crucial to investors, Defendants misleadingly claimed 7% to 8% average historical organic growth during Defendant Papa's tenure as CEO, without disclosing that organic growth (which it did not regularly report) had slowed to a trickle during the six quarters prior to the Relevant Period, and was even negative during some of those periods.

5.     Prior to the Mylan tender offer deadline, Defendants accompanied these inflated projections with express promises of accuracy, completeness, and care under the Irish Takeover Rules, which applied because Perrigo is an Irish company. Irish Takeover Rules require directors to be diligent and acknowledge accountability for their statements to investors. Accordingly, each press release and presentation Perrigo made from the beginning of the Relevant Period (April 21, 2015) through the expiration of Mylan's tender offer assured that: "*The directors of Perrigo accept responsibility for the information contained in this announcement [or presentation].* To the best of the knowledge and belief of the directors of Perrigo (*who have taken all reasonable care to ensure such is the case*), the information contained in this announcement [or presentation] is in accordance with the facts and does not omit anything likely to affect the import of such information."[2]

6.     To discourage Perrigo investors such as Plaintiffs from tendering shares to Mylan, Defendants also issued an inflated profit forecast guiding investors to expect 2016 earnings of $9.30 to $9.83 per share, which Perrigo would later concede was not "realistic." Defendants' manipulation of the profit forecast stood in stark contrast to the promises they made to investors under Irish Takeover Rule 28, which they claimed to understand. Rule 28.1 mandates that "*[e]very such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity.*"[3] Despite these promises, Perrigo and its directors issued aggressive and unrealistic profit forecasts based upon assumptions that were not remotely accurate or objective. For example, they assumed success in achieving Omega synergies despite knowledge of significant problems with the integration, assumed an organic

---

[2] Except where otherwise noted, all emphasis in this complaint is added.

[3] *See* Irish Takeover Rules, *available at* http://irishtakeoverpanel.ie/wp-content/uploads/2014/01/ITP-Takeover-Rules.pdf.

growth rate far higher than the Company had recently been able to achieve consistently, and assumed that Perrigo could continue the collusive price hikes driving profits in its Generic Rx division, even as generic drug pricing came under increased scrutiny. Further, in addition to the accounts of numerous former employees of Perrigo and Omega (among other sources) noted above, and as alleged in detail below, according to CW1, by as early as 2013, Perrigo's organic growth had plateaued so it relied on the practice of accelerating sales to customers, or optimizing sales, to make the Company's numbers look better. CW1 explained that both Papa and Brown would direct subordinates, including CW1's boss, to optimize, but when John Hendrickson was promoted to CEO, replacing Papa in April 2016, Hendrickson told Perrigo employees (including CW1) that the Company would no longer push out inventory to make its numbers look better, and ultimately Perrigo reduced guidance as a result.

7.      In their efforts to defeat the Mylan bid, Defendants also hid the fact that results in Perrigo's most profitable division, Generic Rx, were significantly inflated by illegal price-fixing. Instead of engaging in price competition that usually drives generic drug prices relentlessly downward toward the cost of production, Perrigo and other generics manufacturers colluded to *raise* contemporaneously prices for many generic products by *300% to 500%* or more. These price hikes allowed Perrigo to reap hundreds of millions of dollars in collusive revenues.

8.      Further, throughout the Relevant Period, Defendants falsely presented an inflated value for Perrigo's largest financial asset—its Tysabri Royalty stream—and misclassified that asset as an "intangible asset" in violation of generally accepted accounting principles ("GAAP"), which mandated that the Tysabri Royalty stream be treated as a "financial asset" requiring marking the fair value to market at least each quarter. Perrigo now admits that their repeated assertions that the Tysabri royalty stream was worth $5.8 billion, and that Perrigo's accounting

followed GAAP, were false. The fair value of the Tysabri royalty stream was far less than the $5.8 billion reported by Perrigo throughout the Relevant Period, and Perrigo's accounting for the royalty stream as an "intangible asset" violated GAAP. Through its GAAP violations, overseen by Defendant Brown, Perrigo was able to hide billions of dollars in value deterioration from investors. Because of fraudulent conduct, Perrigo was required to restate earnings and, in a restatement on May 22, 2017—after the Relevant Period—Perrigo conceded that its Relevant Period balance sheets should have recorded billions of dollars of deteriorating fair values, as alleged in more detail below.

9.      In other words, even by Defendants' own account, Defendants misreported more than $1 billion in revenue through GAAP violations.

10.      Defendants' misrepresentations and omissions served their purpose, defeating Mylan's takeover bid. On November 13, 2015, the tender offer was voted down by a misled majority of Perrigo shareholders, with less than 50% of Perrigo investors tendering shares. Because Mylan's tender offer specified that it would proceed only if 50% or more shares were tendered by that date, the offer expired pursuant to its terms. As an immediate consequence of the tender offer's failure, the Plaintiffs and other Perrigo shareholders were forced to hold onto Perrigo stock valued at $140.54 per share on November 13, 2015 (as of when the market opened), when they could have received a value of $174.36 per each Perrigo share (based upon the Mylan share price at the close on November 12, 2015) had the tender offer succeeded.

11.      However, the truth soon began to emerge, causing the value of Perrigo stock to decline. On February 18, 2016, just three months after the failed take-over bid, Perrigo reported fourth quarter 2015 revenue, profits, and margins that were all well below what the Defendants had led investors to believe the Company would achieve. Perrigo revealed that certain Omega

assets would need to be restructured and took a $185 million impairment charge, while also slashing the top end of the Company's 2016 guidance range from $10.10 to $9.80. On this news, Perrigo shares fell $14.77, or more than 10%, to close at $130.40.

12.     Next, on April 22, 2016, Reuters and other news agencies reported that longtime Perrigo CEO and Chairman of the Board, Joseph Papa, the architect of the aggressive promises used to defeat the Mylan bid, would leave Perrigo for Valeant Pharmaceuticals International, Inc. ("Valeant"), a struggling company widely criticized for accounting violations and ethical lapses.[4] Analysts and shareholders understood Papa's exit to mean that the problems at Perrigo were even worse than they were told in February. As a result, Perrigo shares fell $7.33, or 5.7%, to close at $121.53.

13.     The following business day, April 25, 2016, Perrigo announced that Papa was leaving and, to facilitate his exit, Perrigo had waived parts of his non-compete agreement. Perrigo also lowered its 2016 earnings guidance to $8.20 to $8.60 per share, a full $1.40 less (at midpoint) than claimed only three months earlier. The Company further reported that it expected first quarter 2016 earnings to be only $1.71 to $1.77 per share, which it blamed on more competitive generic drug pricing (the natural result of collusion becoming more difficult as regulators focused in on widespread price-fixing in the industry). Perrigo also stated that it was considering additional impairment charges for Omega, assets it touted to fend off the Mylan bid. CNBC commentator Jim Cramer called this a "terrible moment for Perrigo," explaining that Defendant Papa had come on Cramer's show "and talked about how the Mylan bid dramatically

---

[4] Specifically, Valeant has been called "the corporate poster-child for price-gouging" and investigated for potentially illegal practices. *See* R. Boyd, "Valeant, The End of The Michael Pearson Era," *available at* http://sirf-online.org/2017/03/23/valeant-the-end-of-the-michael-pearson-era/.

undervalued Perrigo. . . . ***That was clearly untrue***." The April 25, 2016 partial disclosures

caused Perrigo shares to tumble $21.95, or 18%, to close at $99.40.

14.     On May 12, 2016, Perrigo announced another $467 million impairment charge for

Omega, tripling the original impairment figure, only months after Defendants trumpeted the

success of the Omega acquisition. On this additional news, Perrigo shares fell $3.71, or 4%, to

close at $89.04.

15.     The fall in Perrigo's stock price was tempered, in part, by a new policy announced

by the incoming CEO, John Hendrickson ("Hendrickson"). Going forward, Hendrickson

promised Perrigo would "try to be as transparent as possible" and issue "realistic" forecasts. This

was intended to be, and was taken by investors as, a clear admission that prior guidance under

Papa had been neither transparent nor realistic. Analysts praised Hendrickson's promise of

candor, emphasizing the need to "re-establish credibility" after the prior regime. Despite these

promises, however, Perrigo did not come clean about the full extent of its problems with the

Omega integration, its anti-competitive pricing in the Generic Rx division, or the declining value

of its largest financial asset, the Tysabri royalty stream.

16.     On August 10, 2016, Perrigo announced that it was cutting guidance yet again as

a result of having to implement "transformational organizational changes" at Omega, and

because of additional pricing pressure in the Generic Rx division. Even worse, Perrigo projected

that 2016 impairment charges, which were excluded from this guidance, would nearly double,

from $1.74 per share to $3.29 per share. Consequently, Perrigo shares fell approximately 10% to

close at $86.00.

17.     On September 12, 2016, institutional investor Starboard Value published a

scathing letter critical of the inflated "management and Board sanctioned [growth] claims that

allowed Perrigo to persuade enough shareholders to reject Mylan's offer and support Perrigo's standalone plan," that Perrigo has since slowly deflated.[5]

18.     On December 8, 2016, after announcing that it needed to restructure the entire branded division (consisting mostly of Omega assets), Perrigo shares declined by an additional 2.37%, from $83.94 to $81.94. By the time the year was over, Perrigo had accrued **_over $2 billion_** in impairment charges related to Omega.

19.     On February 27, 2017, Perrigo stunned investors by announcing it would sell the Tysabri royalty stream for only $2.2 billion cash (plus additional contingent payments of up to $0.65 billion), **_billions_** of dollars less than the asset had been recorded on Perrigo's books and presented to investors throughout the Relevant Period. Defendants deliberately hid this deterioration from investors through their GAAP violations and failure to record the fair value of the asset each quarter.

20.     Perrigo also disclosed on February 27, 2017, that it could not timely file its Annual Report on Form 10-K for 2016 because it needed to review historical revenue recognition practices for the royalty stream and other potential issues (which ultimately led to the restatement of every single financial statement issued during the Relevant Period), and disclosed that the person most responsible for the GAAP violations, Chief Financial Officer ("CFO") Judy Brown, was unexpectedly resigning. On these additional disclosures, Perrigo shares dropped another 12%, or $9.91 per share, from $84.68 to close at $74.77.

---

[5] *See* Starboard letter dated September 12, 2016, available at http://www.valuewalk.com/2016/09/starboard-value-delivers-letter-perrigo-company-ceo/; *see also infra* ¶233. All numbers in the Starboard chart reflect the midpoint of the guidance range updates provided by Perrigo for 2016 adjusted earnings per share ("EPS").

21.     On March 3, 2017, Bloomberg reported that Perrigo—like many other generic drug companies—was in the sights of antitrust regulators at the Department of Justice investigating generic drug price-fixing. In a filing made in a private lawsuit, the Department of Justice asked that private discovery be delayed with respect to Perrigo and other manufacturers of generic topical drugs because the government attorneys were worried that private discovery "could reveal details of the ongoing criminal investigation and delay, or even frustrate, its progress." *See* "Perrigo Joins Firms With Generic Drugs Under U.S. Glare," Bloomberg (March 3, 2017), *available at* https://www.bloomberg.com/news/articles/2017-03- 03/perrigo-joins-list-of-firms-with-generic-drugs-under-u-s-glare. This additional disclosure drove Perrigo shares down an additional $2.80 to close at $72.76.

22.     Finally, after the market closed on May 2, 2017, Perrigo announced that its offices had been raided by the Department of Justice as part of a criminal price-fixing probe, a more severe action than was taken against most other generic drug companies. The Wall Street Journal's Charley Grant noted on Twitter: "Federal investigations happen all of the time to companies. Federal raids do not." On this final disclosure, Perrigo shares fell over 5%, or $3.88 per share, to close at $72.35 on May 3, 2017.

23.     Shortly after the Relevant Period, Perrigo issued a restatement admitting that it violated GAAP in every single financial statement issued during the Relevant Period. Audit Analytics noted that Perrigo's restatement was one of the largest issued by any public company over the past two decades.[6]

---

[6] *See* "Perrigo Restates to Correct More than $1 Billion in Errors," June 1, 2017, *available at* http://www.auditanalytics.com/blog/perrigo-restates-to-correct-more-than-1-billion-in-errors/.

24.     In total, Defendants' false and misleading statements caused Perrigo's stock to fall more than 62% and robbed investors of the opportunity to fairly evaluate and participate in a takeover offer worth more than twice the current share price. Defendants Papa and Brown, in particular, were cushioned from this blow. They were awarded millions of dollars in special bonuses for their roles in defeating the Mylan offer. *See* paragraph 133 below.

## II.     JURISDICTION AND VENUE

25.     The claims asserted arise primarily under Sections 10(b), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e), and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of Counts I, II and III pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. Defendant Papa resides in this District and has maintained a residence in this District throughout the Relevant Period. In addition, the Company maintains offices and operations in Piscataway, New Jersey, and Parsippany, New Jersey, which are situated within this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiffs

27.     Plaintiff WCM Alternatives: Event-Driven Fund ("EDF") is a series of Westchester Capital Funds, an open-end management investment company established under the

laws of the Commonwealth of Massachusetts by a Declaration of Trust, dated March 20, 2013. EDF's principal address is at 100 Summit Lake Drive, Valhalla, NY 10595.

28.     Plaintiff WCM Master Trust ("MT") is a master feeder fund incorporated in Bermuda, and its principal address is at 100 Summit Lake Drive, Valhalla, NY 10595.

29.     Plaintiff The Merger Fund ("TMF") is a no-load, open-end, diversified investment company organized as a trust under the laws of the Commonwealth of Massachusetts on April 12, 1982, and registered under the Investment Company Act of 1940, as amended. TMF's principal address is 100 Summit Lake Drive, Valhalla, NY 10595.

30.     The Merger Fund VL ("TMF VL") is a diversified investment company organized as a statutory trust under the laws of Delaware, and its principal address is at 100 Summit Lake Drive, Valhalla, NY 10595.

31.     JNL/Westchester Capital Event Driven Fund ("JNL") is a series of JNL Series Trust, a registered open-end investment company. JNL's principal address is at 100 Summit Lake Drive, Valhalla, NY 10595.

32.     Non-party Westchester Capital Management, LLC ("Westchester Capital" or the "Investment Manager") is a Delaware limited liability company with its principal place of business at 100 Summit Lake Drive, Valhalla, NY 10595. The Investment Manager is a registered investment adviser. The Plaintiff Westchester Funds are investment funds that are advised by Westchester Capital.

33.     Each of the Plaintiffs listed above purchased Perrigo common stock between April 21, 2015 and May 3, 2017, inclusive, collectively held approximately 156,000 shares of Perrigo common stock as of the tender offer date, and suffered damages as a result of the violations pled herein. More specifically, the Plaintiffs were the owners of 155,580 common

shares of Perrigo stock as of the November 13, 2015 tender offer deadline. The following chart

lists the Plaintiffs' holdings as of the November 13, 2015 tender offer deadline:

| Plaintiff Fund | Perrigo shares held as of Nov. 13, 2015 tender offer deadline |
|---|---|
| EDF | 2,658 |
| MT | 2,679 |
| TMF | 144,300 |
| TMF VL | 900 |
| JNL | 5,043 |
| TOTAL | 155,580 |

34.     In connection with Plaintiffs' purchases and sales of Perrigo common stock

during the Relevant Period, the Plaintiff Westchester Funds suffered damages as a result of the

conduct alleged herein.

**B.     Defendants**

35.     Defendant Perrigo is the world's largest manufacturer of over-the-counter

("OTC") healthcare products. Perrigo is also a significant supplier of generic pharmaceuticals,

infant nutrition products, branded pharmaceuticals in Europe (through its Omega acquisition),

and animal health products. Initially founded in 1887 and based for most of its existence in

Allegan, Michigan, in 2013 Perrigo redomiciled as an Irish corporation with corporate

headquarters in Dublin, Ireland. At all periods relevant hereto, Perrigo had significant operations

in New Jersey, including a 14,000 square foot research and development facility in Piscataway

Township. Perrigo describes its Piscataway facility as a "strategic location in the hub of New

Jersey's pharmaceutical industry" that "gives Perrigo a footprint in the northeast." The Company

also operates a research and development facility in Parsippany, New Jersey.

36.     Perrigo's common stock is dual listed on the New York Stock Exchange

("NYSE") (symbol: PRGO) and Tel Aviv Stock Exchange ("TASE") (symbol: PRGO), both

highly efficient markets. As of February 19, 2016, Perrigo had approximately 143 million shares

outstanding.

37.     Defendant Joseph Papa ("Papa") joined Perrigo in October 2006 as its President and Chief Executive Officer ("CEO") and served in that capacity until April 25, 2016. Papa was also a director of Perrigo between November 2006 and April 2016. Papa is currently President and Chief Executive Officer of Valeant.

38.     Defendant Judy Brown ("Brown") served as Perrigo's CFO from July 2006 until her resignation on February 27, 2017.

39.     Papa and Brown are referred to as the "Individual Defendants."

## IV.     DEFENDANTS' FRAUDULENT SCHEME

### A.     Perrigo Experiences Rapid Corporate Growth Through Acquisition

40.     Defendant Perrigo is the successor to Perrigo Company, a Michigan corporation that began in 1887 as a seller of packaged goods ("Former Perrigo"). For more than a century, Former Perrigo was a slow-growing manufacturer and distributor of healthcare products based in tiny Allegan, Michigan and operating primarily in the United States. Former Perrigo focused on store brand versions of popular OTC products such as analgesics and cough syrup, which remain mainstays of the Company to this day.

41.     After Defendant Papa became CEO and Chairman of Perrigo's Board in October 2006, Former Perrigo adopted a "roll-up" strategy, becoming a serial acquirer of healthcare companies. Through these acquisitions, Former Perrigo both grew its core OTC business and expanded into markets like generic prescription drugs, infant nutrition, and animal healthcare.

42.     In 2013, Defendant Perrigo became the successor of Former Perrigo as the result of an "inversion" transaction with Elan, an Irish corporation, which closed on December 18, 2013. That transaction resulted in the formation of a new Irish corporation, Defendant Perrigo Company plc, that was 71% owned by shareholders of Former Perrigo and 29% owned by

shareholders of Elan. Defendant Perrigo trades on the NYSE and TASE under ticker symbol "PRGO."

43.     The inversion structure utilized by Perrigo has been described as "the tax avoidance strategy du jour." Paul Krugman, *Corporate Artful Dodgers*, N.Y. Times (July 27, 2014), https://www.nytimes.com/2014/07/28/opinion/paul-krugman-tax-avoidance-du-jour-inversion.html. It "refers to a legal maneuver in which a company declares that its U.S. operations are owned by its foreign subsidiary, not the other way around, and uses this role reversal to shift reported profits out of American jurisdiction to someplace with a lower tax rate." *Id.* The tactic reportedly allowed Perrigo to save $150 million per year, primarily from avoiding U.S. taxes it would otherwise have to pay. *See* David Gelles, *The New Corporate Tax Shelter: A Merger Abroad*, N.Y. Times Dealbook (October 8, 2013), https://dealbook.nytimes.com/2013/10/08/to-cut-corporate-taxes-a-merger-abroad-and-a-new-home/.

44.     Through the inversion, Perrigo also acquired Elan's major asset, a financial interest in the royalty stream for Tysabri, a blockbuster treatment for multiple sclerosis manufactured and sold by Biogen Inc. (formerly known as Biogen Idec Corporation). Perrigo began to report this royalty interest as a separate reporting unit known as "Specialty Sciences" in its periodic report for the quarter ended December 28, 2013.

45.     As Perrigo now admits, GAAP required Perrigo to account for the acquired royalty stream as a financial asset. Accordingly, under GAAP, Perrigo was required to disclose the fair market value of the Tysabri royalty stream in each quarterly report and to take expenses (or recognize non-operating income) on a quarterly basis for all mark-to-market changes in value. However—as the Company has now admitted—Defendants improperly accounted for the

Tysabri royalty asset and failed to make these required disclosures, concealing from investors the severe deterioration in the value of the Tysabri royalty stream.

46.     Although the inversion transaction made Perrigo an Irish corporation and provided a financial asset—the royalty stream—Perrigo gained no meaningful operations. Just like Former Perrigo, Defendant Perrigo had virtually no presence in continental Europe. After the inversion transaction, Perrigo began to seek a European foothold, which it found in Omega, now included as one of Perrigo's five divisions.

47.     Throughout most of the Relevant Period, Perrigo segmented its results into five major divisions:

(a)     Branded Consumer Healthcare ("BCH" or "Omega Segment"): BCH contained the newly-acquired Omega businesses, as well as a German supplement brand called Yokebe, purchased in 2015, and additional European OTC brands purchased from GlaxoSmithKline in 2015. As of June 27, 2015, the BCH unit marketed approximately 5,200 branded OTC products in Europe, focusing on natural health, vitamins, supplements and minerals, cough and cold, allergy, skin care, weight management, pregnancy and fertility products, sleep aids, and anti-parasitic products such as lice treatments. During the six months ended December 31, 2015, the Omega segment represented approximately 23% of consolidated net sales.

(b)     Consumer Healthcare ("CHC"): Perrigo's CHC unit marketed primarily unbranded and store brand OTC analgesics, cough syrups, smoking cessation products, gastrointestinal remedies, supplements and animal healthcare products. This segment also included nutritional products, such as infant formula, which had previously been reported separately, and its Israeli-based pharmaceutical and diagnostic business, which had previously

been reported as "Other." According to its SEC filings, the CHC division marketed over 4,900 products during the Relevant Period. During the six months ended December 31, 2015, the CHC segment represented approximately 50% of consolidated net sales.

(c)     Generic Rx: Perrigo's Rx unit offered approximately 800 generic prescription drug products (including otherwise OTC drugs that are sold through the prescription channel to obtain reimbursement, which Perrigo calls ORx). The Rx unit focused on "extended topical" treatments, such as creams, ointments, gels, sprays, foams, powders, suppositories and shampoos. During the six months ended December 31, 2015, the Rx segment represented approximately 20% of Perrigo's consolidated net sales.

(d)     Specialty Sciences: Specialty Sciences consisted of the royalty stream Perrigo received from Biogen for Biogen's sales of Tysabri. Perrigo was entitled to a royalty rate of 18% of annual worldwide sales of Tysabri up to $2.0 billion, and 25% of sales above $2.0 billion. During the six months ended December 31, 2015, Specialty Sciences was reported to represent approximately 6% of Perrigo's consolidated net sales. Subsequently, in May 2017, Perrigo conceded that none of the royalty stream receipts should have been labeled "sales" or included in operating results.

(e)     Other: This division includes Perrigo's Active Pharmaceutical Ingredient ("API") business, which manufactures active ingredients sold to other healthcare companies. While Perrigo does not separately report a percentage of total sales figure for the "Other" segment, deducting the percentages represented by the remaining segments, this segment contributed approximately 3% to the Company's net sales in the six months ended December 31, 2015.

**B.**     **Perrigo Makes Its Largest Acquisition Ever and Quickly Experiences Major, Known Integration Issues**

48.     Perrigo attempted to expand into Europe in late 2014 by making its largest acquisition ever. On November 6, 2014, Perrigo announced it would acquire Omega for €3.6 billion, or $4.5 billion. The acquisition closed on March 30, 2015, just before the beginning of the Relevant Period in this action. Omega was one of the largest OTC healthcare companies in Europe and had a commercial presence in 35 countries. Like Perrigo, Omega operated as a roll-up, growing primarily through acquisition. However, unlike Perrigo, Omega focused on name brand products rather than store brand or unbranded products.

49.     Omega was far larger and more complex than any other company Perrigo had previously acquired. With annual revenues of approximately $1.6 billion, approximately 2,500 employees (including an 1,100 employee sales force), a portfolio of several thousand branded products, decentralized management, and a mishmash of IT systems, Omega posed an integration challenge far more substantial than Perrigo had ever previously faced.

50.     Defendants were aware of considerable integration and operating challenges with Omega. Perrigo was exposed to these challenges during the extensive due diligence prior to the acquisition. As described in deal documents, Perrigo was provided a confidential package of information regarding Omega businesses during the latter half of July 2014 and engaged with the assistance of its professional advisors between September 7, 2014, and November 4, 2014, in additional due diligence into Omega group companies and their "business, operations, assets, liabilities, legal, tax, commercial and accounting and financial condition." *See* Purchase Agreement, attached as Exhibit 10.1 to Form 8-K filed on November 12, 2014. As part of this due diligence, Perrigo and its advisors were given access to a confidential "data room," participated in a presentation by Omega management on September 25, 2014, conducted

meetings with management of Omega and Omega group companies, and were provided further information in the form of answers to written questions. *Id.*

51.     Defendants described the Omega acquisition as a key part of the 5% to 10% organic growth they trumpeted in their opposition to Mylan's tender offer. As Defendants explained during the Relevant Period, their profit forecast assumed the Omega assets would deliver organic growth at the midpoint of that range, or 7.5%. *See* Form 8-K filed on October 22, 2015. Perrigo's growth assumption for Omega *was more than double* the 3.2% organic growth that Omega's management had independently projected for 2013–2017 as part of its goodwill calculation. *See* 2013 Omega Annual Report at 42. While Papa claimed that he had prepared his own elevated assumption for Omega's organic growth in compliance with the "scrupulous care, accuracy and objectivity" standard required under Irish Takeover Rules, he was, in fact, aware of extensive integration problems, among others, at Omega imperiling Perrigo's aggressive guidance.

52.     A former Director of Marketing at Perrigo ("Confidential Witness 1", or "CW1") from prior to the beginning of the Relevant Period until April 2017 explained many of these known integration issues when CW1 was interviewed in the course of Plaintiffs' investigation. Indeed, according to CW1 and as further detailed below, it was clear almost immediately after the Omega deal closed on March 30, 2015 that Omega was substantially underperforming, the integration had stalled and was marred by pervasive problems, and the synergies touted by Perrigo and its executives, including Papa and Brown, were a mirage.

53.     CW1 worked out of Perrigo's Allegan, Michigan office and reported to Tom Cotter, Vice President of OTC Marketing, who reported to Jeff Needham, Executive Vice President and General Manager of U.S. Consumer Health at Perrigo. CW1 handled marketing for

Perrigo's core over-the-counter drugs business. CW1 made regular quarterly presentations to Perrigo executives, including Papa and Brown. CW1 explained that CW1 was very familiar with the Omega acquisition, including how Omega performed immediately following the acquisition, and traveled to Omega (in Belgium) to work on its marketing and potential product offerings around May 2016.

54.     In or around June or July 2015, while in the process of putting together business plans for fiscal year 2016, Omega transfer/legacy products began to be transitioned to CW1's team at Perrigo. According to CW1, it was clear at that time that the Omega business was struggling (as recounted below), but issues with the acquisition and Omega's business were obvious to CW1 and other Perrigo employees prior to then—and almost immediately following the March 30, 2015 closing of the Omega acquisition.

55.     CW1 explained that, unlike the other acquisitions that CW1 had been involved with at Perrigo, the Omega acquisition seemed to happen very quickly. CW1 further explained that after the acquisition closed, based on the deal model or synergies that were proposed between the two companies, it was clear that there was nothing there, stating that it felt like facts and figures had been made up, particularly with respect to Omega products being marketed and sold in the U.S. and Perrigo products being marketed and sold in Europe.

56.     CW1 recalled looking at the deal models, which according to CW1 were overinflated, included targets that CW1 could not understand, and made no sense. CW1 questioned the numbers in the deal models and was told that they were created by an external consultant, McKinsey, that CW1 understood Papa and Brown had hired on behalf of Perrigo. According to CW1, this was unlike any other acquisition CW1 had been involved with at Perrigo. CW1 regularly interfaced with Perrigo's Merger and Acquisition (M&A) or Brand

Team that CW1 believed should have made the deal models given CW1's understanding that Perrigo previously had always utilized its internal M&A team for that purpose. CW1 went on to say that the projected 7% growth was a fallacy because it was based on products that were never actually released in the United States, and could not be marketed in the United States the same way as in Europe due to known regulatory differences.

57.     According to CW1, there were projections related to anticipated Omega product releases in the United States that were never released (and were unlikely to ever be released) in the United States. Even if they could be released, they were unlikely to be as profitable as they were in Europe, according to CW1. CW1 cited as an example Omega's homeopathic cough syrup, Bronchostop, which contains thyme herb and marshmallow root extracts as the active ingredients. CW1 explained that Papa was always touting Bronchostop in relation to the Omega acquisition. According to CW1, Perrigo had relied on McKinsey instead of its internal teams to project that business. According to CW1, rather than doing very well in the United States as Defendants projected, Bronchostop was never released in the United States, and it should never have been included in Perrigo's projections. According to CW1, Bronchostop contained ingredients that would never be approved by regulators for release in the United States. According to CW1, by July 2017, only one Omega product had been released in the United States, a chocolate flavored cough syrup (not Bronchostop)—and even that was a small release[7]—and noted that a different Omega product, a weight loss supplement/diet aid (XLS), would never gain traction in the United States. CW1 explained that Perrigo had an internal dashboard that tracked each product.

---

[7] CW1 estimated this product accounts for a total of about $500,000 in revenue annually.

58.     According to CW1, there were several factors that made it clear that Omega would not be successful in the United States. According to CW1, regulatory or governing bodies in the United States (particularly the FDA) impose different and potentially more stringent drug approval rules and marketing requirements, as well as other differences between the European and American markets that hindered the introduction of new products. CW1 explained that many of Omega's top products are homeopathic, which are more difficult to market in the United States than in Europe because the FDA and other American regulators are very particular about the way such substances can be marketed in the United States, including prohibiting the use of certain terminology. CW1 explained that in Europe, Omega could claim things like Bronchostop stops coughs, but, in the United States, regulators would never allow a homeopathic product like Bronchostop to be touted or marketed in such a manner.

59.     Sales of Perrigo's legacy products in Europe also faced regulatory headwinds. According to CW1, Perrigo would have trouble marketing their legacy products in Europe because they would be seen as having too many chemicals. Even if such legacy products could be sold in Europe, European consumers would be less likely to purchase them than American consumers. CW1 explained that the European market was not receptive to the U.S. drugs since it tends to prefer the homeopathic route when treating minor ailments. CW1 offered as an example a Perrigo legacy allergy medicine being projected to make $50 million in Europe, even though senior management knew that this was not feasible given the European proclivity for using homeopathic remedies.

60.     CW1 also explained that initially there was a lack of meaningful integration between the two companies, and CW1 and other Perrigo employees were told by Needham to leave Omega alone—i.e. to not divert resources to, or assist with, the integration. CW1 recalled

how Perrigo employees kept asking executive management why the two companies were not

being integrated. CW1 added that CW1's boss, Needham, initially did not want his team working

on the Omega part of the business because he was not responsible for it, and Needham refused to

give resources to Omega. CW1 participated in phone calls and conversations with Omega

personnel immediately following the acquisition, but CW1 recalled a directive from Needham

when the Omega acquisition first occurred that his team was not to get too involved with Omega.

CW1 explained that Needham kept a very lean team and resented that Papa would not give him

more resources, so Needham was not willing to assist Omega until 2016.

61.     CW1 was puzzled by Perrigo's decision initially to leave Omega alone because,

for the first few quarters, it was clear that Omega was not meeting financial expectations in 2015.

CW1 reviewed internal reports based on deal models and financials that showed Omega's

performance. According to CW1, Omega was always underperforming in 2015. CW1 knew this

because CW1 viewed the reports. CW1 explained that it had become clear that Omega was

suffering and not performing well certainly by the second half of 2015—by which point Omega

became part of the five business segments that made up Perrigo's overall finances and was

missing/underperforming by significant dollars.

62.     According to CW1, Papa and Brown both had access to the reports referenced by

CW1 showing that Omega was significantly underperforming. According to CW1, those reports

made it clear that Omega was missing revenue targets from the start, and CW1 recalled that

Omega was missing such targets by at least 20% but possibly even as much as 30%.

63.     CW1 recalled that Perrigo's quarterly internal financials were reporting

something totally different from what Defendants were touting to the market about Omega in

connection with responding to Mylan's takeover bids. According to CW1, the internal consensus

was concern because there were no synergies between the companies. This became even clearer to CW1 when CW1 traveled to Omega's Belgium headquarters with other high-level Perrigo employees, including Vice Presidents of marketing, regulatory and product development, around May 2016. CW1 recalled being asked to go to Belgium while Papa was still CEO, and the directive to make the trip came directly from Papa to Needham. CW1 recalled that, during that trip, CW1's colleagues (from legacy Perrigo and Omega) admitted the lack of synergies.

64.     The lack of synergies and underperformance of Omega from the outset of the acquisition is further corroborated by information attributed to Christine Kincaid ("Kincaid"), Perrigo's Global Cyber Security Manager from June 2015 to December 2015, as well as other unnamed former Perrigo and Omega employees, in complaints filed in *Roofers' Pension Fund v. Perrigo Co., plc*, No. 2:16-cv-02805-MCA-LDW, ECF No. 89 (D.N.J. June 21, 2017) (the "Amended Securities Class Action Complaint" or "ASCAC") and in *Carmignac Getion, S.A. v. Perigo Company PLC*, No. 2:17-cv-10467, ECF 1 (D.N.J. Nov. 1, 2017) (the "Carmignac Complaint" or "Carmignac Compl.").[8] As alleged in the Amended Securities Class Action Complaint and in the Carmignac Complaint, Kincaid also "explained many of these known integration problems," as well as others. *See, e.g.*, ASCAC ¶¶57-62; Carmignac Compl. ¶¶48, 82, 84-95, 100-06, 108, 142. "Kincaid served for a portion of her tenure as the Company's acting Chief Security Officer, reporting directly to the Chief Information Officer ("CIO"), Tom Farrington, who also served as Defendant Papa's direct appointee to oversee the Omega integration."[9] ASCAC ¶57. "Kincaid was responsible for IT integration projects in Europe." *Id.*

---

[8] Ms. Kincaid's last name has been changed to Ray, as noted in the Carmignac Complaint. *See* Carmignac Compl. ¶48.

[9] Defendant Papa stated during a June 2, 2015 investor call, that "there was a specific person that I had designated in my Company who heads up all my integrations. And I said, Tom, you

*(continued . . . )*

"Kincaid indicated that IT integration between Perrigo and Omega had completely stalled by mid-2015." *Id.*; *see also, e.g.*, Carmignac Compl. ¶84 ("when [Kincaid] joined Perrigo, integration between Perrigo and Omega was at a complete standstill"). "The standstill caused Farrington to instruct her in July of 2015 to reach out to her direct counterpart in Belgium—the Omega segment's head of IT—to find out why integration was not advancing." *Id.*; *see also, e.g.*, Carmignac Compl. ¶¶82-84.

65.     "According to [] Kincaid, at [] Farrington's direction as well as through her standard integration responsibilities, she had multiple conversations with the Omega head of IT integration, who recounted to Kincaid in detail various issues that were causing 'discord' between Omega CEO and CFO, to whom the Omega head of IT reported to directly, and the top executives of Perrigo, including the Individual Defendants." ASCAC ¶58; *see also, e.g.*, Carmignac Compl. ¶¶82-84. "In addition to conversations with her Omega counterpart, she personally experienced major integration impediments as well as cultural discord between Omega and Perrigo." ASCAC at ¶58; *see also, e.g.*, Carmignac Compl. ¶¶82-84.

66.     "For example, [] Kincaid explained that EU regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain"[10] (ASCAC ¶59), and

---

*( . . . continued)*

need to help us successfully integrate Omega. That's your role. Make sure it happens. And that's your focus."

[10] In particular, the home country of the Omega business segment making the purchase is the primary preferred source of suppliers, other EU member states were the second, and non-member countries the third. ASCAC ¶59. As such, changing Omega's source of manufactured drugs from existing EU suppliers to Perrigo—which manufactured in the U.S.—would change the terms of service for numerous existing and future Omega service contracts with its customers and may cause serious disruption to those customer relationships. *Id.*

Kincaid also explained that replacing Omega's EU suppliers with Perrigo's U.S.-based suppliers proved to be problematic and cut into Perrigo's margins. *See* Carmignac Compl. ¶¶93-95.

would require Perrigo to discount products to make them competitive in the EU (Carmignac Compl. ¶108). "As Kincaid indicated, during July and August of 2015, Omega's most senior executives tried on multiple occasions to communicate such and other concerns to Papa and Brown but were frustrated by their refusal to engage in discussions about these issues (in part because Perrigo's senior executives appeared more focused on fighting the Mylan takeover)." ASCAC ¶59; *see also* Carmignac Compl. ¶108. *"*Kincaid was told by the Omega IT head that he himself was personally instructed by [] Coucke in mid-2015 to put integration on hold pending resolution of these problems." ASCAC ¶59. "Frustration boiled over to the point where some Omega salespeople stopped attending meetings with Perrigo's executive management[,]" and "[Kincaid's] impression, based on the calls and meetings she attended, was that the frustration applied to sales challenges at all Omega locations." Carmignac Compl. ¶108.

67.     "Additionally, [] Kincaid explained that Defendant Papa's understanding of the integration problems was reflected by his mid-2015 appointment of Mary Donovan, an Irish executive, as an additional representative to bridge communication gaps between Perrigo's U.S. operations and Omega." ASCAC ¶60. "According to [] Kincaid, one of Donovan's first acts upon being appointed to the role was to pay a week-long visit to Allegan, Michigan in order to meet with the IT development teams, Perrigo's Chief Technology Officer (known at Perrigo as the VP of Global Infrastructure) Brian Marr, other project managers, and Kincaid herself, to discuss the integration." *Id.* "Kincaid explained that during this visit, [] Donovan hosted meetings in which numerous integration issues, including breakdowns in communication, IT processes, and other problems, were acknowledged and discussed in detail." *Id.*

68.     "[Kincaid] also stated that Perrigo leadership was told by Omega personnel that full migration of Omega data from each country location could not be completed based on the

incompatible operating systems and applicable EU regulations, but that Perrigo continued to ignore the negative impact of the issue." Carmingac Compl. ¶100. "[Kincaid] met, spoke on conference calls, or emailed with senior level personnel at both Perrigo and Omega at least monthly, and sometimes weekly, to discuss compliance and regulation problems related to migrating Omega's data from Germany to the U.S." *Id.* "These personnel included: (i) Farrington; (ii) Marr; (iii) Makowski; (iv) Donovan; (v) Deneubourg; and (vi) Jill Gilbert, SAP System Architect, who also reported to Farrington." *Id.* "[Kincaid] stated that the Omega integration team had weekly reporting responsibilities to CIO Farrington." *Id.* at ¶101. "To this end, Makowski, Farrington's Chief of Staff, would send a weekly email requesting a status report." *Id.* "[Kincaid] would respond to both Farrington and Makowski providing updates on her conversations with Deneubourg and Donovan and the aforementioned integration calls and meetings." *Id.* "Often times, [Kincaid] would have no information to report because Deneubourg was out of the office from July 2015 through August 2015 (returning part-time in September 2015) with a broken leg, such that integration efforts 'came to a standstill'....[, and] local IT issues were taking precedence over the Omega/Perrigo integration." *Id.* at ¶¶101-102.[11]

69.     "[Kincaid] explained that during meetings and calls that took place during her tenure, Farrington confirmed that he had reported the Omega data migration issues to Papa and sought assistance at the highest levels—from Papa and Perrigo's Board—to remedy those issues." *Id.* at ¶103. "As one example, [Kincaid] recalled that Farrington told Papa during the summer of 2015 that the migration had not occurred, that the project was stalled, and that Deneubourg was injured." *Id.* "As another example, Farrington mentioned to [Kincaid] and other

---

[11] Indeed, according to the Carmignac Complaint, when queried if Deneubourg was "ridiculously understaffed," Kincaid responded, "yes." *Id.* at 102.

members of Perrigo's integration team during at least two or three meetings leading up to the August 2015 Perrigo Board meeting, that he spoke with Papa about dedicating funds to hire an assistant for Deneubourg." *Id.* "Kincaid and the integration team even put together a 'CapEx forecast' and 'Request for Hire,' detailing the need for the hire as it pertained to the stalled integration project." *Id*. "The Board, led by Papa, not only denied the request in August 2015, but again in October 2015, when it deferred consideration until January 2016." *Id.* at ¶104. "Farrington told the integration team that he attempted (without success) to make the case for the position several times with Papa during the August 2015 through November 2015 timeframe." *Id.*

70.     "[Kincaid] explained that several Omega senior members of sales leadership felt their concerns regarding the Omega data migration issues were being ignored during meetings with Perrigo executives, including Papa and Perrigo Board members." *Id.* at ¶105. "According to [Kincaid], during July and August 2015, Omega's senior-most executives made several attempts to report their concerns to Papa and Brown, both of whom refused to engage in additional discussions." *Id.* "[Kincaid] recalled that Omega leadership felt that Perrigo, preoccupied with the Mylan takeover bid, disregarded or minimized the negative impact of the debilitating migration issues." *Id.* "Indeed, Omega's head of IT, Deneubourg, specifically told [Kincaid] that Coucke had instructed him in mid-2015 to put integration to the side." *Id*.

71.     "Based on conversations that [Kincaid] had with Farrington and those that took place during integration meetings and conference calls, [Kincaid] understood that Brown met with Farrington at least weekly and was aware of the integration issues and failures." *Id.* at ¶106. "[Kincaid] also recalled that in August 2015, Donovan came to the U.S. and briefed everyone on

the overall integration challenges with respect to Omega, including technology and security issues." *Id.*

72.    "Perrigo was unable to migrate Omega's financial data and performance information to Perrigo's SAP system." *Id.* at ¶82. "This critical issue stemmed from the incompatibility between Perrigo's and Omega's data management systems, which was or should have been obvious to Defendants during their due diligence period prior to acquiring Omega." *Id.* Indeed, Kincaid indicated that "for a variety of technical and operational reasons, Perrigo had not even come close to completing the technology integration of Omega" (ASCAC ¶62(b))— including "the establish[ment] of a centralized SAP system in Germany, where Omega's central data center was to be maintained" (Carmignac Compl. ¶84)—by the time she left the Company in December 2015. ASCAC ¶62(b); Carmignac Compl. ¶84.

73.    "[Kincaid] explained that any questions posed by Perrigo to Omega concerning its financial data or performance required the respective Omega location to manually check all data relevant to the inquiry and report back to Perrigo, which 'definitely had an impact' on Perrigo's operations." Carmignac Compl. ¶89. "As one example, [Kincaid] explained that any time Perrigo needed to create a report consolidating any financial information from Perrigo's and Omega's respective operations, particularly for senior leadership, the Company had to manually collect reports from each of the thirty-five franchises and merge them together." *Id*. "This process could take at least three weeks for each such report, and Defendants knew or recklessly disregarded that it was highly susceptible to error and prevented Perrigo's management from having a true picture of Omega's performance." *Id*.

74.    "[Kincaid] recalled that until at least the end of November 2015, Perrigo had no visibility into trends in the Omega sales or supply chain and lacked an understanding of the

causes of variances in projected sales or expenses because the Company had no access to the underlying detail." *Id*. at ¶91.

75.     Additionally, "Kincaid stated that in September 2015, Brian Marr, who (like her) reported to Tom Farrington, asked Kincaid to 'quietly and discretely' identify and hire a forensic IT analytics firm to go to Belgium, where it would be tasked with analyzing senior Omega executives' e-mail traffic to ascertain whether any of Omega's top executives had revealed material confidential business information to Mylan to aid Mylan's takeover." ASCAC ¶61. "Kincaid identified the firm but left Perrigo before the team was sent to Belgium." *Id.* "She noted, however, that the need for such forensic analysis was indicative of the extent to which deep distrust had manifested between Perrigo and Omega's top executives." *Id.* "All of this occurred as Defendants touted integration of, and synergies with, Omega's business as a key source of growth." *Id.*; *see also* Carmignac Compl. ¶85.

76.     The ASCAC (at ¶62) and Carmignac Complaint (including at ¶¶49-57, 81-116, 141-142) also include additional former Perrigo and Omega employees who corroborate CW1's and Kincaid's accounts of the stalled integration process from an operational perspective and who recounted multiple further operational impediments that corroborate and expand on the accounts of CW1 and Kincaid, including allegations concerning: (a) the poor organizational structure at Omega (*see, e.g.*, ASCAC ¶62(a)); (b) IT integration problems, including difficulties integrating Omega's IT systems with Perrigo's (*see, e.g.*, ASCAC ¶62(b); Carmignac Compl, ¶¶82-109); (c) management resistance, including that Coucke and other Omega managers were not cooperating with Perrigo in the integration (*see, e.g.*, ASCAC ¶62(c)); (d) Perrigo's diversion of resources and budget to fight the Mylan bid (*see, e.g.*, ASCAC ¶62(d); Carmignac Compl. ¶104); and (e) underperformance in key Omega markets and unrealistic expectations relating to

Omega, including Defendants' misleading revenue projections for Omega that not only were unsupported but were actually contradicted by internal data, and failed to disclose significant issues and underperformance impacting Omega revenues (*see, e.g.*, ASCAC ¶62(e); Carmignac Compl. ¶¶110-16, 141, 302).

77.     Given the magnitude and duration of these problems with Omega during the Relevant Period, Perrigo was far from being in position to benefit from the Omega acquisition. Despite having knowledge of these material problems with the Omega integration, Defendants continued to point to Omega's value as the primary basis for rejecting Mylan's multiple offers in communications with investors.

## C.    Perrigo's Organic Growth Slows Considerably Just Before the Relevant Period

78.     Throughout Papa's reign as CEO, the Company touted its ability to grow organically, as well as through acquisition.[12] For example, in early 2014, Papa explained that organic growth had accounted for half (8%) of Perrigo's 15% to 16% revenue growth over the past four years, and that the Company targeted organic revenue growth of 5% to 10% during any rolling three-year period. *See* Dominic Coyle, *Takeover of Elan the perfect fit in Perrigo's prescription for growth*, Irish Times (Feb. 7, 2014), https://irishtimes.com/business/health-pharma/takeover- of-elan-the-perfect-fit-in-perrigo-s-prescription-for-growth-1.1682196. By blending older, high growth periods with newer low-growth periods, Perrigo was able to create

---

[12] Perrigo calculates "organic growth" as the year-over-year change in net sales after deducting sales attributable to acquisitions made in the twelve (12) months preceding the given period. *See, e.g.*, October 22, 2015 earnings release, Table III. Organic growth generally refers to growth by increased output, expanded customer base, or increased demand and sales, rather than by acquisition.

the deceptive impression of organic growth levels it had not consistently achieved for many quarters.

79.     Plaintiffs here determined that Perrigo's actual organic growth rates during the six quarters preceding the Relevant Period averaged approximately 1%—and were even negative for two of those quarters—by relying on the same methodology alleged in the ASCAC (at ¶64) and utilized by the Class Action plaintiff's forensic accounting expert (the "Accounting Expert"):

| Quarter ending | 12/28/2013 | 3/29/2014 | 6/28/2014 | 9/27/2014 | 12/27/2014 | 3/29/2015 |
|---|---|---|---|---|---|---|
| Actual organic growth rate | **6.5%** | **0.9%** | **6.7%** | **-9.0%** | **-0.2%** | **0.9%** |

To determine these rates for each quarter, Plaintiffs here, like the Accounting Expert, first calculated Perrigo's Net Sales without the Tysabri royalty stream, which the Company recently admitted cannot be included in net sales under GAAP. *See* ASCAC ¶64 (citing ASCAC ¶123); *see also infra* ¶147. Next, to obtain organic revenues, sales attributable to acquisitions that were made during the preceding year were deducted.[13] *See* ASCAC ¶64. Finally, Plaintiffs here, like the Accounting Expert, deducted organic revenues from revenues reported in the prior year

---

[13] Specifically, for the quarter ending December 13, 2013, sales attributable to recent acquisitions Velcera ($5.2 million) and Rosemont and Fera ($26.3 million) were excluded to calculate organic revenue. For the quarter ending March 29, 2014, sales attributable to Velcera and Aspen ($6.1 million) and Rosemont and Fera ($17.1 million) were excluded to calculate organic revenue. For the quarter ending June 28, 2014, sales attributable to Aspen ($6 million) and Fera ($20 million) were excluded to calculate organic revenue. For the quarter ending September 27, 2014, sales attributable to Aspen ($6 million) and methazolomide ($3.8 million) were excluded to calculate organic revenue. For the quarter ended December 27, 2014, sales attributable to Aspen ($6 million, estimated based on prior quarter), methazolomide ($3.8 million, estimated based on prior quarter), and Lumara ($6.03 million, estimated based on subsequent quarter disclosure) were excluded to calculate organic revenue. That certain of Plaintiffs' inputs and assumptions relating to sales attributable to recent acquisitions differed slightly from those alleged in the ASCAC (*compare* ASCAC ¶64 n.10, ¶105 n.13) did not lead to materially different results.

quarter to determine organic revenue growth and expressed that as a percentage (rounded to the nearest tenth).

80.     Perrigo's opaque financial reporting obscured the deterioration in organic growth and prevented investors from making these calculations on their own. Perrigo did not disclose organic growth in most periodic reports, and throughout the Relevant Period misreported net sales in violation of GAAP by including royalty income. Moreover, Perrigo did not consistently break out the impacts of recent acquisitions and repeatedly changed the way it presented financial statements.

81.     But that was not the only way Defendants attempted to maintain the mirage of Perrigo's ability to grow organically. According to CW1, by as early as 2013, Perrigo's organic growth had plateaued so it needed to find new ways to make it appear that the Company had growth trajectory. CW1 explained that one way Perrigo relied on was through optimizing—the practice of accelerating sales to customers.

82.     More specifically, according to CW1, Perrigo began as early as 2013 to optimize, which was a directive that came directly from CEO Papa. CW1 was in meetings where Papa would direct his subordinates to optimize or stuff inventory into the channel. CW1 further advised that CW1 would hear this on leadership calls. CW1 then recounted how Papa would make direct requests to Needham to optimize more, and how Brown would make similar requests. CW1 added that this went on for years and that it got out of control. According to CW1, at the end of CW1's last fiscal year at Perrigo (2016), Perrigo had optimized $40 to $45 million worth of inventory at year end. Because of this practice Perrigo began the year in the hole with less demand for product than there would have otherwise been. CW1 added that Perrigo in recent years was optimizing at least $15 to $20 million a quarter in CW1's division. It

was CW1's understanding that optimizing was happening throughout Perrigo and not just in CW1's business unit.

83.     CW1 explained that Perrigo sales were suffering from the trends in the market, and Perrigo attempted to make up these deficiencies (in sales) by optimizing. CW1 described optimizing as a vicious cycle because once you begin stuffing the channel like that, you cannot stop. CW1 added that Perrigo was incentivizing their sales employees by giving them bonuses for pipe filling or optimizing, and optimizing was a lot of pressure, especially for Perrigo's sales team who was interfacing directly with the customers.

84.     CW1 further explained that at year-end, during Christmas week, Perrigo would have a shutdown, which would be used to push Perrigo's customers to take on more inventory prior to year-end. CW1 recalled how Perrigo employees would call their buyers to push the inventory out, which ultimately put Perrigo in the hole at the beginning of the following year. CW1 recalled that CW1's boss, Needham, pushed back on the culture of optimization at Perrigo because he was uncomfortable with the $40 million worth of optimized inventory. CW1 further recalled based on CW1's conversations with Needham that Papa would pressure Needham to optimize. According to CW1, it was well known within Perrigo that the purpose of optimizing was to create a false appearance of organic growth.

85.     According to CW1, when CEO John Hendrickson was promoted (April 2016), he told Perrigo employees (including CW1), that the Company would no longer push out inventory to make their numbers look better. CW1 continued to say that Perrigo's recent reduced guidance is a direct result of Perrigo stopping the optimization. CW1 added that Hendrickson told CW1 and others that he was taking Perrigo back to its roots. CW1 reiterated that Hendrickson said no more optimizing and ultimately reduced guidance.

**D.**   **Perrigo's Generic Rx Results Were Boosted by Anti-competitive Practices And Not Insulated From Pricing Pressures**

86.   While Perrigo was principally known as a manufacturer of store brand OTC products, the operating segment with the greatest impact on earnings was not its consumer healthcare (CHC) division, but Generic Rx. For the six quarters prior to the Relevant Period, the Generic Rx division contributed more to Perrigo's adjusted net operating earnings than any other segment:

| Quarter ending: | 12/28/2013 | 3/29/2014 | 6/28/2014 | 9/27/2014 | 12/27/2014 | 3/28/2015 |
|---|---|---|---|---|---|---|
| Generic Rx adjusted net operating income | **$123.1m** | **$100.3m** | **$122.3m** | **$81.1m** | **$127.7m** | **$120m** |
| Rank among Perrigo operating divisions | **1st** | **1st** | **1st** | **1st** | **1st** | **1st** |

Source: Perrigo press releases dated 2/6/14, 5/7/14, 8/14/14, 11/6/14, 2/5/15, 4/21/15 (reporting operating income by division, 10-K filed May 22, 2017 (restating operating income to exclude Tysabri royalty stream).

87.   Accordingly, Perrigo's ability to maintain its profit margin in the Generic Rx business was of paramount importance to investors. Perrigo claimed to enjoy these margins because the topical generic sector in which it focused was difficult for competitors to enter. For example, at the J.P. Morgan Healthcare Conference on January 13, 2014, Papa told analysts that:

> Our Rx segment, generic Rx segment, has been a real star for us. This segment has really been a focus on going after products that are generic equivalent products, but importantly staying away from just simple oral tablets and going after what we call extended topicals. And by extended topicals, they fall under the category of dermatology, absorbed topically through the skin, absorbed topically through the lungs; nasal products absorbed topically through the nasal mucosa; ophthalmic and otic are the areas that we predominantly focus on. And the reason why that's important is that it's much harder to bring these products to the market to be clear, but once you get them to the marketplace they're much harder for other competitors to come into the space.

In other words, as Papa explained, Perrigo had "unique positioning" because its Generic Rx business was focused on products where it could be "one of two or three players entering a market rather than one of 20 players."

88.     Generic drugs are drugs that enter the market after a patent monopoly has expired. Because they must be demonstrably equivalent in therapeutic effect to the branded drug, they are differentiated only by price. In functioning markets, generic drugs provide substantial price breaks for consumers as increased competition drives prices towards the marginal cost of production. Reviewing a study of data prior to the collusive activities alleged herein, the United States Food and Drug Administration ("FDA") concluded that "[g]eneric competition is associated with lower drug prices[.]" *See* U.S. Food & Drug Ass'n, Generic Competition and Drug Prices (last updated May 13, 2015), https://www.fda.gov/aboutfda/centersoffices/officeof medicalproductsandtobacco/cder/ucm129385.htm. Specifically, the FDA determined that prices should decline substantially where at least two generic manufacturers have entered the market:



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

*Id*. A Federal Trade Commission study reached the same conclusion, finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug

prices." *See* Fed. Trade Comm'n, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions (Jan. 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/ pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

89.     In the six quarters preceding the Relevant Period, Perrigo's Generic Rx unit relied on anti-competitive markets to generate its "star" performance. In contrast to the price declines that are typically associated with maturing generic markets, Perrigo relied on collusion with other manufacturers of generic drugs, or in some cases took advantage of pre-existing price-fixing conspiracies, to engage in unprecedented price hikes that could never be accomplished in a competitive market. According to a Wall Street Journal analysis into generic drug price fixing, *eight of the nine best-selling Perrigo generic drugs analyzed had price boosts of up to 531% since September 2013:*



**Potent Hikes**
The cost of many of Perrigo's best-selling drugs increased considerably under CEO Joseph Papa.

| Pre-2011 price — 2016 price | Comparative name brands* | Percent change |
|---|---|---|
| Betamethasone dipropionate – lotion .05% (1 ml)  $0.75 | Diprolene | ▲ 275% |
| Clindamycin phosphate – topical solution 1%† (1 ml)  $3.15 | Cleocin T | ▲ 140% |
| Clobetasol propionate – gel .05% (1 gm)  $9.87 | Clobevate | ▲ 495% |
| Desonide – cream .05% (1 gm)  $5.35 | Tridesilon | ▲ 529% |
| Econazole nitrate – cream 1% (1 gm)  $6.54 |  | ▲ 495% |
| Halobetasol propionate – cream .05% (1 gm)  $4.57 | Ultravate | ▲ 151% |
| Mupirocin – ointment 2% (1 gm)  $0.51 | Bactroban | ▼ 75% |
| Permethrin – cream 5% (1 gm)  $3.09 | Elimite | ▲ 531% |

Source: Connecture        *Not available for all drugs   †Base price is from September 2013        THE WALL STREET JOURNAL.

*See* J. Rockoff and M. Rapoport, *Valeant's New CEO Brings Familiar Prescription*, Wall St. J. (July 5, 2016), https://www.wsj.com/articles/valeants-new-ceo-brings-familiar-prescription-1467745749. Experts from SSR Health LLC cited in the Wall Street Journal concluded, "Generic drug prices rose significantly in 2013 and 2014 . . . and Perrigo upped the list prices of its generics more than many rivals. The list prices of Perrigo's drugs rose 52% over the past four years, compared with an average 18% across manufacturers." *Id*. A Perrigo spokeswoman quoted in the Wall Street Journal article conceded, "we take our competitors' pricing into account" when raising prices for Perrigo generics. *Id*.

90.    Plaintiffs' counsel here retained an economic analyst with deep experience in investigating antitrust allegations to examine the Perrigo generic drugs identified by the Wall Street Journal, and analyzed in the ASCAC, for signs of collusion. Plaintiffs' economic expert determined that there were strong indicia of collusion, including dramatic price hikes contemporaneous with competitors following industry conferences and a startling absence of price variance following these hikes, in many of Perrigo's most important generic drugs— desonide cream and ointment, econazole cream, permethrin cream, tretinoin cream, clobetasol gel and foam, and halobetasol cream and ointment—identifying no material differences from the analysis in the ASCAC. Because generic drugs by different manufacturers were therapeutically equivalent and interchangeable by pharmacists, there would be strong incentive for the manufacturers of these generic drugs to try to gain market share by lowering price in a normal, unaffected market. Moreover, each of the above-listed drugs had a highly-concentrated market structure susceptible to collusion, inelastic demand because most of the price increases fell to third-party payors, and high barriers to entry due to the requirement that new competitors first obtain an abbreviated new drug approval ("ANDA") from the FDA. Third-party data services

such as Symphony Health Services, IMS and First Data Bank provided weekly pricing updates, transmitting prices among market participants. Finally, there were no non-collusive factors that could explain the rapid and coordinated price increases initiated by Perrigo and its so-called "competitors."

###### 1. Desonide

91.    Perrigo's pricing of Desonide cream shows clear signs of collusion with Taro Pharmaceuticals ("Taro") and other generic manufacturers. Desonide is a mild topical corticosteroid that has been used to treat a variety of skin conditions since the 1970's and has been available in generic form for decades. For years, competition among generic manufacturers kept prices stable, at relatively low levels. Prior to the Relevant Period, Perrigo and Taro dominated the market for the most prevalent form of generic Desonide, external cream:



92.    In February and April 2013, representatives of Perrigo and Taro met at the annual meetings of the Generic Pharmaceutical Association from February 20–22, 2013, in Orlando, Florida; the National Association of Chain Drug Stores ("NACDS") from April 20–23, 2013, in

Palm Beach, Florida; and the June 4–5, 2013, Generic Pharmaceutical Association CMC workshop in Maryland. As is described in pleadings filed by the attorneys general ("AGs") of forty-six states following a lengthy, ongoing investigation into generic drug price-fixing, such industry meetings are used by generic pharmaceutical executives to "sow the seeds for their illegal agreements," which are refined via private meetings and communications. *See, e.g.*, Amended Complaint, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056, ECF. No. 168, ¶7 (D. Conn. Mar. 1, 2017); *see also* Plaintiff States' [Proposed] Consolidated Amended Complaint, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Nos. 16-MD-2724, 16-AG-27240, ECF No. 3-1, ¶9 (E.D. Pa. Oct. 31, 2017) (proposed amended complaint expanding state AGs' suit by targeting twelve more drug companies (for a total of eighteen), thirteen more drugs (for a total of fifteen), and senior executives of two of the defendant drug companies, including Rajiv Malik, Mylan's president and executive director).[14]

93.     Promptly after these trade meetings, between April and June 2013, Perrigo and Taro both abruptly raised Desonide prices by approximately 600%. Thereafter, Perrigo and Taro

---

[14] Perrigo is not currently named as a defendant in the state AGs' actions. However, as Connecticut Attorney General George Jepsen explained, after two years of investigation his office has "evidence of widespread participation in illegal conspiracies across the generic drug industry." *See* Press Release, Office of the Attorney General, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies*, (Dec. 15, 2016), http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341. In an interview with The New York Times, Jepsen stated that the existing complaint was "just the tip of the iceberg." He stressed that the "investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit." *See* Katie Thomas, *6 Generic Drug Makers Accused of Fixing Prices*, N.Y. Times, B2 (Dec. 16, 2016).

Further, on October 31, 2017, Jepson stated that "[o]ur ongoing investigation continues to uncover additional evidence, and we anticipate bringing more claims involving additional companies and drugs at the appropriate time." Press Release, Office of the Attorney General, *AG Jepsen Leads Coalition in New, Expanded Complaint in Federal Generic Drug Antitrust Lawsuit*, (Oct. 31, 2017), http://www.ct.gov/ag/cwp/view.asp?Q=597392&A=2341.

continued to maintain this high fixed price, and other manufacturers which began to sell generic Desonide did so at the prices fixed by Perrigo and Taro:





According to the calculations of Plaintiffs' expert, between 2013–2016, Perrigo's prices for generic Desonide were nearly 97% correlated with those of Taro Pharma USA, and were 100% correlated with prices from new market entrants Actavis and G&W Labs. These coordinated, extreme price hikes and the complete lack of price variation following fixing are both strong indicia of collusion.

94.    During the Relevant Period, an article in eDermatology News noted that there was no rational basis for generic Desonide price hikes:

> [R]ecently I've become aware of a new wrinkle that complicates daily practice life for both doctors and patients in a significant way. I can't make any sense of it.
>
> I mean the high price of desonide.

When I was [a] student many years ago, my teachers told me that I should prescribe generic drugs whenever possible. This would help hold down medical costs. It was the right thing to do.

\*\*\*

But lately I've been getting complaints from patients about the high cost of desonide. My first reaction to these was, "How on earth is that possible?"

\*\*\*

I asked my secretary to call the pharmacy to get a price for other generic steroid creams. Triamcinolone would cost $14.70. Alclometasone would cost $35.20.

And desonide – generic desonide – would cost $111.70. For a 15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

Alan Rockoff, M.D., *The high price of desonide*, eDermatology News (Feb. 3, 2015),

http://www.mdedge.com/edermatologynews/article/96892/high-price-desonide.

95.    The coordinated price hikes substantially increased monthly Desonide revenues

for Perrigo and other generic manufacturers:



96.     Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of Desonide cream. Indeed, as alleged in the Amended Securities Class Action Complaint (at ¶76), the lead plaintiff's expert determined that Perrigo derived $98.3 million in collusive revenues across its formulations of generic Desonide for 2014, $49.7 million for 2015, and $22.6 million for 2016.[15]

### 2.    Econazole

97.     Similarly, anti-competitive pricing can be seen in generic Econazole, a prescription cream marketed since 1982 and available in generic form since 2002, which is used to treat skin infections such as athlete's foot, jock itch, and ringworm. Like Desonide, Perrigo dominated the generic Econazole market in the years preceding the Relevant Period:



---

[15] As detailed in the ASCAC, the lead plaintiff's expert determined the collusive revenues that Perrigo earned by supracompetitive pricing of Desonide and the other compounds discussed below through a multi-step process under which the expert first ascertained what the price per unit would have been but for the collusion. *See* ASCAC ¶76 (describing methodology and assumptions).

98.     Just as with Desonide, Perrigo and other manufacturers made unprecedented, coordinated price hikes in generic Econazole cream prices just after attending industry meetings, in this case the February 19–21, 2014, Generic Pharmaceutical Association annual meeting in Orlando, Florida and the June 3–4, 2014, Generic Pharmaceutical Association CMC workshop meeting in Maryland:



**Collusive Marker: Price Hikes after Conference**

*Source: Expert Calculations, Symphony Health Solutions*

According to the calculations of Plaintiffs' expert, between 2014–2016, Perrigo prices for generic Econazole cream were 97.82% correlated with prices from Igi Labs, and 78.76% correlated with prices from Taro. As with Desonide, the lockstep, extreme price hikes and lack of price variation following fixing of generic Econazole indicate a high likelihood of collusion.

99.     The coordinated 2014 price hikes in generic Econazole were extremely lucrative. For Perrigo and the other two substantial producers of generic Econazole, Taro and Igi, monthly revenues ramped substantially following the price hikes:



100.    Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of Econazole cream. As alleged in the ASCAC (at ¶80), the lead plaintiff's expert determined that Perrigo reaped $72.5 million in collusive revenue from generic Econazole cream in 2014, $125.2 million in 2015, and $53.6 million in 2016.

### 3.    Permethrin

101.    Collusion is also evident in the 300%+ contemporaneous price hikes that Perrigo and other generic manufacturers rammed through for permethrin cream, a prescription treatment for lice and scabies that is on the World Health Organization's List of Essential Medicines. Permethrin has been available in branded form since 1986 and in generic form since 1998. Perrigo, which has sold Permethrin since 2003, dominates the market, selling far more than its peers Actavis Pharma and Renaissance Acquisition Holdings (now a division of Mylan):



102.    Although economic theory and the actual experience documented by the FDA in competitive generic drug markets indicates that when additional competitors enter the market, prices should drop (*see supra* ¶88), Perrigo successfully increased prices for Permethrin as competitors entered the market:



Even with these large hikes, Plaintiffs' expert has calculated that Perrigo's prices for generic Permethrin cream remained nearly 99.4% correlated between 2011–2015 with those of Actavis. Such lockstep pricing is strong indicia of collusion. Moreover, each price hike occurred after industry conferences, specifically the February 2011 and 2013 annual meetings of the Generic Pharmaceutical Association, which are industry meetings that have been identified by the Department of Justice for their role in facilitating price-fixing in the generic drug industry. *See supra* ¶92.

103.    The coordinated price hike caused monthly sales to increase substantially for both Perrigo and Actavis, demonstrating the benefit of the price-fixing conspiracy to its participants, and the demand inelasticity of Permethrin:



*Source: Expert Calculations, Symphony Health Solutions*

104.    Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of Permethrin external cream. As alleged in the ASCAC (at ¶84), the

lead plaintiff's expert determined that Perrigo received collusive revenues for Permethrin cream totaling $79.1 million in 2014, $60.4 million in 2015, and $73.8 million in 2016.

### 4.    Tretinoin

105.    While Perrigo may not have been responsible for initiating collusion in generic Tretinoin, a topical treatment for acne more commonly known as Retin-A, it certainly enjoyed inflated returns because of price fixing in this market. Perrigo acquired a portfolio of tretinoin products from Matawan Pharmaceuticals, a division of Rouses Point Pharmaceuticals ("Rouses"), in December 2015. Perrigo had previously served as the authorized generic distributor of these products from 2005 to 2013, so it was familiar with what pricing in this market should have been in a normal competitive market. At all relevant times, the portfolio of products distributed by Perrigo, briefly sold by Rouses itself, then reacquired by Perrigo, dominated the market for generic Tretinoin:



106.    Lockstep price increases were implemented while the Tretinoin portfolio was controlled by Rouses, which were maintained after Perrigo's December 2015 purchase:



Source: Expert Calculations, Symphony Health Solutions

According to the calculations of Plaintiffs' expert, between 2013–2016, Perrigo's prices for generic Tretinoin external cream were highly correlated with prices from Spear Derm and Actavis—specifically, according to those calculations, Perrigo prices for generic Tretinoin external cream were nearly 93% correlated with prices from Spear Derm and 95% correlated with Actavis Pharma.[16] Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of Tretinoin external cream. As alleged in the ASCAC (at ¶86), the lead

---

[16] In calculating the correlation between Spear Derm's and Actavis' prices for generic Tretinoin, Plaintiffs' expert reached results that were not materially different to those alleged in the Amended Securities Class Action Complaint. *See* ASCAC ¶86 (alleging that Actavis' prices for generic Tretinoin were 82% correlated with Spear Derm's prices).

plaintiff's expert determined that Perrigo's results were inflated by $84.1 million in collusive revenue from generic Tretinoin revenues in 2016.

### 5. Clobetasol

107. Clobetasol is a potent corticosteroid used to treat eczema, dermatitis, and psoriasis, among other skin conditions. Many formulations of Clobetasol, another important Perrigo generic drug, also showed signs of collusion. For example, for generic Clobetasol gel, Perrigo was the dominant producer throughout the Relevant Period in a market with only four substantial participants:



Source: Expert Calculations, Symphony Health Solutions

108. For the gel formulation of Clobetasol, the other three substantial producers engaged in coordinated, collusive price hikes in 2014, simultaneously inflating prices by several hundred percent. In January 2016, Perrigo joined the existing price-fixing conspiracy and raised its own prices five-fold so that they were approximately identical to all other competitors.

Because all other market participants had agreed to maintain the same anti-competitive prices, and because demand for Clobetasol gel was extremely inelastic, Perrigo's price inflation led to a huge spike in monthly sales:



Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of Clobetasol gel. As alleged in the ASCAC (at ¶88), the lead plaintiff's expert determined that Perrigo's collusive revenues across various formulations of Clobetasol were $28.0 million in 2014, $21.1 million in 2015, and $43.0 million in 2016.

### 6.    Halobetasol propionate

109.    Another key topical generic drug, halobetasol propionate, shows similar evidence of collusion. Halobetasol propionate is a corticosteroid used on the skin to reduce swelling, redness, and itching due to certain dermatological conditions. It has been available in generic form since 1990. Perrigo dominated the market for generic halobetasol propionate ointment, along with another manufacturer, G&W Labs:



110.    Perrigo and G&W Labs kept their prices highly correlated between 2012–2016, including a massive lockstep hike in 2013 just after the annual meeting for the Generic Pharmaceutical Association:



111.    The coordinated price hikes in halobetasol propionate ointment were very

profitable for both Perrigo and G&W Labs. Monthly sales revenue from the drug more than

doubled for both Perrigo and G&W Labs immediately following the lockstep 2013 price hike:



*Source: Expert Calculations, Symphony Health Solutions*

Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of

Halobetasol Propionate ointment. As alleged in the ASCAC (at ¶91), the lead plaintiff's expert

determined that the collusive revenues from halobetasol propionate were $17.7 million in 2014,

$15.4 million in 2015, and $14.4 million in 2016.

### E.    To Fend Off Hostile Bid from Mylan, Defendants Inflate Growth Projections.

112.    On April 8, 2015, Mylan made an unsolicited offer directly to Perrigo

shareholders to acquire the Company for $205 per share in cash and stock, a premium of

approximately 25% above the price that Perrigo shares had closed at the prior trading day, and

substantially above any price at which Perrigo shares had traded for the entire history of the

Company. In the public offer letter addressed to Defendant Papa, Mylan Chairman of the Board

Robert Coury stated:

> As you and I have discussed on a number of occasions over the past few years, a combination of Mylan and Perrigo offers clear and compelling strategic and financial benefits, has sound industrial logic, and would create a global leader with a unique and one-of-a-kind profile. We have complementary operations across all of our businesses, both from a product and geographic perspective. In an environment where scale and reach are becoming increasingly important, the combination of our companies would result in an unmatched global platform, substantial revenue and operating synergies, and enhanced long-term growth potential, all of which would serve to create significant value for the combined company's shareholders and other stakeholders.
>
> Based on our many conversations over the years and my knowledge of Perrigo, I have often noted the similarity in the culture and core values of our two companies. We both place paramount emphasis on integrity, respect and responsibility in our commitment to provide the world's 7 billion people access to the broadest range of affordable, high quality medicine. We also have a common focus on innovation, reliability and excellent customer service. Most importantly, all of our people are dedicated to creating better health for a better world, one person at a time. This shared culture and these common values will be key contributors to a successful integration.
>
> For the foregoing reasons, I am writing on behalf of Mylan to propose a combination of Mylan and Perrigo in a transaction that would deliver to your shareholders significantly greater near-term and long-term value than they could otherwise obtain on a standalone basis. Our proposal is the natural culmination of our prior discussions and reflects our shared vision for the industry. This is the right time for our two companies to move forward together, and Mylan and our Board are firmly committed to making this combination a reality.
>
> ***Specifically, we propose to offer Perrigo shareholders $205 in a combination of cash and Mylan stock for each Perrigo share, which represents a greater than 25% premium to the Perrigo trading price as of the close of business on Friday, April 3, 2015, a greater than 29% premium to Perrigo's sixty-day average share price and a greater than 28% premium to Perrigo's ninety-day average share price.***

> *Our proposal provides a very significant cash payment to Perrigo shareholders.* In addition, even with conservative assumptions for what we believe to be significant and meaningful synergies coming from both companies, our proposal provides Perrigo shareholders with an even greater equity value in the combined company than they currently have in Perrigo today.
>
> In addition to the compelling value to shareholders, a combination of Mylan and Perrigo would offer substantial benefits to the other stakeholders of both companies. In particular, the combination would provide a broader variety of opportunities to our employees and increased stability for the communities in which we operate and serve. The position of our creditors and suppliers would be enhanced by the combined company's scale and significant free cash flows, and patients would receive improved access to affordable, high quality medicine through increased scale across geographies and robust capabilities to drive innovation.

*See* Form 425 filed by Mylan on April 8, 2015.

113.    Because Perrigo is an Irish company, Mylan's April 8, 2015 proposal commenced an offer period under the Irish Takeover Rules, which strictly governed both Mylan's bid and Perrigo's defense against the bid. In particular, to prohibit unsubstantiated claims to support or defeat an offer, Irish Takeover Rules require the directors of the offeror and offeree, when making public statements, to "*accept responsibility for the information* contained in the document or advertisement and [to state] that, to the best of their knowledge and belief (having taken all reasonable care to ensure that such is the case), *the information contained in the document or advertisement is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information.*" Irish Takeover Rule 19.2.

114.    Because financial projections by the offeror and offeree can unfairly influence takeovers, Irish Takeover Rules further require that every profit forecast by an offeror or offeree "(including the assumptions upon which it is based) *shall be compiled with scrupulous care, accuracy and objectivity by the directors* of the offeror or (as the case may be) of the offeree…" Irish Takeover Rule 28.1.

- 55 -

115.    In response to the announcement, investors sent both stocks sharply higher. Analysts were similarly positive. Bank of America/Merrill Lynch stated, "From a business combination perspective, this makes sense to us as it brings together two companies with arguably best-in-class operations in the generic (MYL) and OTC (PRGO) spaces." Barclays wrote: "We believe a combination between MYL and PRGO would offer a unique value proposition to their customers. . . ." Deutsche Bank concluded that "the combination of these companies makes a lot of strategic sense. . . . MYL represents a de-risking as PRGO would otherwise be in a multi-year globalization phase." UBS predicted that the combined stock would move higher over the next year. Market observer Jim Cramer opined that "[t]hese two would be a match made in heaven." *See* Summary of Analyst Opinions, Form 425 filed by Mylan on May 5, 2015, at slide 32.

116.    On or about April 21, 2015, Defendants decided to reject Mylan's unsolicited bid and keep Perrigo an independent company. To make their case to investors, Defendants both concealed the true deterioration of Perrigo growth and affirmatively misrepresented the truth. In a press release that day, Perrigo falsely told investors that Mylan's $205 bid "substantially undervalues the Company and its growth prospects," and that the offer "does not take into account the full benefits of the Omega Pharma acquisition."

117.    In an investor presentation also held on April 21, 2015, Defendants ramped up their claims that an independent Perrigo was worth more than $205 because it had a "durable competitive position" and a "compelling growth strategy." *See* Investor Presentation, Slide 3, Ex. 99.2 to Form 8-K filed on April 21, 2015. Papa accepted personal responsibility in writing for the April 21, 2015 investor presentation, making the representations required by Irish Takeover Rule 19.2 and set forth in paragraph 93 above. *See* Ex. 99.2 to April 21, 2015 Form 8-K, Slide 1.

118.     In a slide entitled "Proven Financial Track Record," Defendants claimed that Perrigo had a "proven history of meeting our goals," identifying organic net sales growth of 7% between 2011 and 2014, and also had "the ability to keep delivering" growth in the 5–10% range. *Id.* at slide 10. For its Generic Rx division, Perrigo enhanced its hype even further, telling investors to expect growth in the 8% to 12% range. *Id*. at slide 9. In the oral part of the presentation, Papa claimed to "see additional upside for Perrigo on the horizon over and above" the organic growth goal. Defendants omitted entirely the fact that organic growth had slowed substantially, had not reached 7% in any of the last six quarters, and that even the growth reported was boosted by anti-competitive practices in the Generic Rx division and the unsustainable optimizing of sales.

119.     Perrigo called its growth strategy "base plus plus plus," which it depicted visually with a pyramid:



The base was the existing businesses with their inflated 5–10% growth projections. Layered on top of that was the industry trend of switching from prescription to OTC, which theoretically

helped the core CHC business but had failed to deliver much upside for several quarters. At the very top of the "base plus plus plus" pyramid, above mergers and acquisitions, was the projection of "Tysabri upside" from possible new indications in stroke and secondary progressive multiple sclerosis.

120.    The April 21, 2015 presentation was also misleading with respect to generic drug pricing. Defendant Papa falsely told investors that "[o]n the question of pricing…our goal on pricing has been the same goal, really for all the time, almost nine years I've been at Perrigo. What we seek to do on our pricing is keep pricing flat to up slightly." In truth, Perrigo had massively spiked prices of many of its most important generic drugs by colluding with other generic manufacturers and/or joining prices fixed by existing illegal conspiracies.

121.    Regarding Omega, Defendants' presentation claimed the acquisition was "accretive to Perrigo's organic growth profile," *see* Ex. 99.2 to April 21, 2015 Form 8-K, slide 24, and Papa further exclaimed, "[w]e're very pleased with our initial integration projects." In fact, Papa and the other Defendants were aware of the serious problems with the integration and management of Omega and also knew that Omega management had modeled long-term organic growth of just 3.2%, well below the 5–10% range claimed by Perrigo.

122.    Defendants repeated these misrepresentations and omissions, and made additional misrepresentations and omissions throughout the offer period, all of which are detailed in Section V below.

123.    On April 24, 2015, Mylan made a legally binding commitment to tender for Perrigo shares at $60 cash plus 2.2 Mylan shares per Perrigo share tendered. At Mylan's closing price that day of $76.06, the revised bid was worth over $227 per share. Perrigo's board again rejected the offer and encouraged shareholders not to tender shares.

124. On April 29, 2015, Mylan increased its bid again, this time to $75 cash plus 2.3 Mylan shares per Perrigo share tendered. At Mylan's closing price of $74.50 on April 29, 2015, the revised bid was worth over $246 per share. Again, Perrigo's board rejected the offer and encouraged shareholders not to tender shares.

125. While promoting Perrigo's organic growth claims to investors, Defendants knew that organic growth was eroding. For the six quarters reported before the Relevant Period, Perrigo had averaged approximately 1% in organic growth, a slowdown it did not report to investors. *See supra* ¶79. In the second calendar year quarter of 2015, organic growth turned negative, for both the quarter and the trailing twelve months.[17] Nonetheless, to encourage investors to ignore this deterioration, Defendants issued an investor presentation on August 6, 2015, purportedly developed under the strict requirements of the Irish Takeover Rules, reiterating that organic growth targets remained intact and claiming to have a "strategy for delivering 5-10% organic growth." *See* August 2015 investor presentation, *available at* https://www.sec.gov/Archives/edgar/data/1585364/000158536415000093/august2015investorpre sen.htm. However, at the time: (a) Perrigo had not been able to consistently deliver organic growth in that range over the last six quarters; (b) Perrigo was having substantial problems integrating its largest acquisition, Omega; (c) Perrigo and other generic drug competitors were facing considerable headwinds as increasing scrutiny from regulators and customers made it more difficult to obtain the supracompetitive pricing driving results in Perrigo's Generic Rx

---

[17] Specifically, Plaintiffs determined that Perrigo's organic growth for the quarter ended June 27, 2015, was approximately -2.1%, calculated in the manner described in paragraph 82 and adjusted to exclude inorganic revenue from the recent acquisitions of Omega ($401.2 million), Gelcaps ($4.5 million), and Lumara ($6.03 million, estimated), and the average organic growth over the four quarters ending June 27, 2015 was thus approximately -2.6%.

division; and (d) although masked by Perrigo's accounting violations, the fair value of Perrigo's largest financial asset, the Tysabri royalty stream, had already started to plummet.

126.   By the time of Perrigo's August 2015 investor presentation, generic drug makers were under increasing scrutiny for price-fixing. Four manufacturers, including Actavis, which shared the lucrative generic Retin-A (tretinoin) market with Perrigo, had disclosed that they received subpoenas from the United States Department of Justice's Antitrust Division related to generic drug pricing and collusion. An article published on August 7, 2015, in FiercePharma (a widely-followed daily news resource for pharmaceutical executives), reported that "the DOJ is looking into whether trade associations were used as a conduit to trade drug-pricing information." *See* Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), http://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain. This put Perrigo in the spotlight of regulators, as it had increased prices of several generic drugs by several hundred percent or more in coordination with competitors shortly after trade association meetings. *See* Section IV(D).

127.   On September 14, 2015, Mylan commenced its formal tender offer to purchase Perrigo shares. As Mylan had earlier promised, Perrigo shareholders would receive $75 in cash and 2.3 Mylan ordinary shares for each Perrigo ordinary share tendered. The deadline to tender shares was November 13, 2015, and the offer required only 50% of shares to be tendered. Mylan described its offer to Perrigo shareholders as deciding between one of two scenarios: either accept a "highly attractive offer" including $75 in cash and a total value substantially greater than Perrigo's market price, or, alternatively, receive no cash and risk a significant decline in the

value of Perrigo's stock, while "weathering the delays and potential execution and integration risk inherent in Perrigo's standalone strategy."

128.    On September 17, 2015, Defendants urged Perrigo investors to reject Mylan and not tender shares into the offering. The letter to investors issued that day by Defendants Perrigo and Papa boasted that since 2007, "we *have successfully integrated 27 acquisitions* with trailing 12-month net sales of more than $3.2 billion, all while maintaining our relentless focus on return on invested capital. *Simply stated, Perrigo has an outstanding track record of value creation and our future is bright*." In fact, Perrigo had not successfully integrated its largest acquisition, Omega, had not been able to consistently deliver organic growth in that range over the last six quarters, and had covered up value destruction for its largest financial asset, the Tysabri royalty stream, by applying the wrong accounting treatment and refusing to mark the asset to its fair market value quarterly as GAAP required.

129.    On October 22, 2015, Perrigo announced results for the third calendar quarter, emphasizing income growth in the Generic Rx division without disclosing the anti-competitive practices boosting that growth. As with the prior quarterly release, Perrigo masked the diminished value of its largest financial asset, the Tysabri royalty stream, by, as they later admitted, failing to account for the change in fair value as required by GAAP. Perrigo also announced that it would cut costs by laying off 800 workers, and authorized a debt-fueled $2 billion share buyback. However, Defendants did not disclose that cutting workers would impair Perrigo's organic growth and integration efforts.

130.    That same day, Defendants doubled down on their materially misleading profit forecasts, purportedly issued under the strict standards of the Irish Takeover Rules. With the Mylan takeover deadline only weeks away, Defendants projected not only strong results in the

remainder of the 2015 calendar year, but also blockbuster returns for 2016. Defendants touted a baseline earnings projection of $9.30 per share and projected that share buybacks and efficiency gains would further boost that figure to $9.83 per share. In a letter supplied to shareholders issued pursuant to the Irish Takeover Rules, and filed with the SEC as an attachment to Form 8-K on October 22, 2015, Defendants acknowledged their obligation to make "certain attestations to those profit forecasts." They further conceded that the directors prepared the profit forecast, and did so based on growth assumptions which were expressly "within the directors' influence and control."

131.    Defendants' misrepresentations and omissions succeeded. On November 13, 2015, Perrigo investors tendered less than the 50% threshold, ending Mylan's takeover bid. Instead of receiving $75 cash and additional equity compensation, Perrigo investors had to face Perrigo's true prospects as an independent company.

132.    On January 11, 2016, Defendants Perrigo and Papa issued a press release adjusting 2016 earnings guidance to reflect two accretive acquisitions made in December 2015. According to the press release, Perrigo's purchase of a generic version of Entocort added $0.35 per share to the projection, and its purchase of various generic Retin-A (tretinoin) formulations added another $0.20. As a result, Perrigo and Papa claimed that Perrigo would earn $9.50 to $10.10 per share.

133.    Although Defendants' misleading efforts cost Perrigo shareholders dearly, they enriched Defendants Papa and Brown. Perrigo's Board of Directors awarded Papa and Brown a "special cash bonus" of $500,000 and $375,000, respectively, for their "key contributions related to Mylan's takeover attempt." Also, on December 28, 2015, the Board granted restricted stock to

Papa worth $1.5 million, and to Brown worth $375,000 to further "recognize" their merger

defense "contributions." *See* Perrigo Form PRE 14A filed with the SEC on March 4, 2016.

### F.   Defendants Hide Billions of Dollars of Deterioration in Perrigo's Largest Financial Asset by Violating GAAP

134.   Throughout the Relevant Period, the royalty stream for Tysabri was Perrigo's

largest financial asset and played an important role in the "base plus plus plus" growth strategy

Defendants claimed as a basis to reject Mylan's takeover offer. High margin revenues from

existing indications were an important part of the base for which Perrigo predicted 5% –10%

organic growth, and the potential for additional revenues from new treatment indications in

stroke and secondary progressive MS was so significant that it formed its own "plus" layer,

which Defendants visually depicted at the top of their revenue pyramid. *See* ¶119.

### 1.   Applicable GAAP Requirements

135.   GAAP include those principles recognized by the accounting profession as the

conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial

statements filed with the SEC that are not presented in accordance with GAAP will be presumed

to be misleading, despite footnotes or other disclosures. The Financial Accounting Standards

Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP

into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been

adopted as the framework for financial reporting for all public filers. In addition, the FASB has

issued guidance in the form of FASB Concept Statements ("FASCON"s), which set the

objectives, qualitative characteristics, and other concepts used in the development of GAAP, and

which reflect the underlying basis and framework for the promulgation of accounting standards.

136.    Financial statements (including footnote disclosures), like those filed on Forms 10-Q and 10-K with the SEC, are a central feature of financial reporting. One of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), which, as its title provides, represents, along with other FASCONs, the framework for financial accounting, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." FASCON 8, ¶ OB2.

137.    This framework also states that "[d]ecisions by existing and potential investors about buying, selling, or holding equity and debt instruments depend on the returns that they expect from an investment in those instruments," and that "[i]nvestors', lenders', and other creditors' expectations about returns depend on their assessment of the amount, timing, and uncertainty of (the prospects for) future net cash inflows to the entity." FASCON 8, ¶ OB3.

138.    FASCON 8 also states that, in order to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders and other creditors need information about the resources of the entity, [and] claims against the entity." FASCON 8, ¶ OB4. It also states that investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources." *Id*.

139.    Because investors, lenders, and other creditors rely on financial statements for much of the financial information they need to make rational decisions regarding the entity, they

are considered to be the primary users to whom general purpose financial reports are directed. FASCON 8, ¶ OB5.

140.    A primary quality that renders financial information useful to investors, creditors, and other users in their decision-making is <u>faithful representation</u>. For an entity to faithfully represent what it purports to represent, including its financial position and the results of its operations for selected periods of time, information must be complete, neutral, and free from error. FASCON 8, ¶ QC12. To be complete, the financial information must include all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. FASCON 8, ¶ QC13. To be neutral, the financial information must be without bias in the selection or presentation of such information. FASCON 8, ¶ QC14. The standard describes a neutral depiction of financial information in more detail as follows:

> A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users. Neutral information does not mean information with no purpose or no influence on behavior. On the contrary, relevant financial information is, by definition, capable of making a difference in users' decisions.

*Id.*

141.    Significantly, for financial assets like the Tysabri royalty stream, GAAP requires the assets be measured at their fair value at the end of each reporting period subsequent to their initial measurement. *See* ASC 815-10-35-1.

## 2.    Defendants' Accounting Admittedly Violated GAAP

142.    Throughout the Relevant Period, Perrigo falsely stated that the value of the Tysabri royalty stream was ***$5.8 billion***. This was not the fair market value of the royalty stream, and Defendants dodged the reporting of current fair market values by violating GAAP. While the

Company was unquestionably required to account for the royalty stream as a "financial asset," marking the fair value to market at least each quarter, the Company instead treated it as if it were an "intangible asset." The Company now admits this treatment violated GAAP. *See* Form 10-K filed on May 22, 2017. As a result of this accounting maneuver, investors were prevented from learning that the royalty stream had lost billions of dollars of value.

143.     The Company concedes that its accounting for the Tysabri royalty stream violated GAAP. As the Company admitted in May 2017:

> After an extensive evaluation of the facts and circumstances and the judgments required to determine the appropriate classification, it was determined that under existing U.S. GAAP the contingent payments from Elan's May 2013 sale of Tysabri® to Biogen (the "Tysabri®royalty stream") ***should have been recorded as a financial asset, rather than an intangible asset, on the date of our acquisition of Elan.***
>
> Our Tysabri®royalty stream is now accounted for in our consolidated financial statements for 2016 and prior restated periods as a financial asset using the fair value option. We made the election to account for the Tysabri financial asset using the fair value option as we believe this method is most appropriate for an asset that does not have a par value, a stated interest stream, or a termination date. Accounting for the Tysabri® royalty stream as a financial asset required us to adjust our financial statements for the Restated Periods to (1) remove the Tysabri® royalty stream from net sales in our Consolidated Statements of Operations, (2) remove the amortization expense (reflected in cost of goods sold) associated with recording the Tysabri® royalty stream as an intangible asset, and (3) include the quarterly changes in fair value of the Tysabri® royalty stream as a component of other non-operating income/expense. The cash payments we received from the royalty stream are included in our Consolidated Statements of Cash Flows for the Restated Periods and reflect the cash received from the Tysabri® royalty stream as cash from investing activities, rather than as cash from operating activities.

*Id*. Perrigo knew all along that the Tysabri royalty stream was a financial asset. The Company never operated any business involving Tysabri, and in a May 2016 conference call with investors, then-CEO John Hendrickson expressly called the royalty stream a "financial asset."

Accordingly, there was no basis for Perrigo to dodge the accounting required by ASC 815-10-35-1.

144.     Perrigo's restatement is an admission that its Relevant Period financial statements were materially false when made. GAAP defines a "restatement" as:

> The process of revising previously issued financial statements to reflect the correction of . . . [a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared.

ASC 250-10-20; *see also* ASC 250-10-45-17 (distinguishing that a mere "change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods").

### 3.     Defendants' Used GAAP Violations to Hide Billions of Dollars of Deterioration in Fair Value

145.     Perrigo's GAAP violations were used to create the impression that the valuation of the Tysabri royalty stream remained intact, even as its actual value plummeted due to known adverse clinical and competitive developments.

146.     In June 2015, the phase II trial for Tysabri as a treatment for stroke failed to meet its primary endpoint. This indication was one of the two potential new indications that Defendants Perrigo and Papa touted as "Tysabri upside" and placed at the very top of their "base plus plus plus" pyramid slide presented to investors. *See* paragraph 100. Instead of recording the diminution in fair value associated with this adverse development, Perrigo violated GAAP and told investors that the Tysabri royalty stream had the same value as before: $5.8 billion.

147.     The "Tysabri upside" thesis fell apart in October 2015 when the phase III trial for the other proposed new indication, secondary progressive MS, also failed.

148.     Tysabri's core indication for primary MS also came under attack in October 2015, when Phase III trial results for ocrelizumab, a competing drug, were so positive that experts called it a "game changer." *See Phase III studies show Roche's ocrelizumab reduces relapse rate, delays disability progression in MS patients*, News Medical (Oct. 12, 2015), http://www.news-medical.net/news/20151012/Phase-III-studies-show-Roches-ocrelizumab-reduces-relapse-rate-delays-disability-progression-in-MS-patients.aspx. In February 2016, the FDA designated ocrelizumab a "breakthrough therapy." *See* Press Release, Roche (Feb. 17, 2016),https://www.roche.com/investors/updates/inv-update-2016-02-17.htm.

149.     Nevertheless, Defendants continued to insist the Tysabri asset was not impaired. Perrigo's February 22, 2016 Form 10-KT, signed by each of the Individual Defendants, again referenced a $5.8 billion valuation for the Tysabri royalty stream. Even worse, the Form 10-KT stated that despite these negative developments, the royalty stream's "fair value exceeded its carrying value." This was false. As the Company now concedes, its internal calculations show that the fair value of the Tysabri royalty stream dropped from $5.42 billion in June 2015 to only $5.02 billion on April 2, 2016. By the end of 2016, the fair value was *only $2.35 billion – less than half of the figure referenced in the February 22, 2016 Form 10-KT.*

150.     Defendants' GAAP violations and blatantly false valuation assertions prevented investors from understanding the deterioration in Perrigo's largest financial asset. Investors did not learn the extent of these losses until the Tysabri royalty stream was sold on February 27, 2017, for only $2.2 billion (plus contingent payments that could total up to $650 million).

151.    In May 2017, to correct their GAAP violations, Defendants took one of the largest

restatements of any public company since 2001. As accounting consultancy Audit Analytics

noted:

> Back in March, we predicted that Perrigo would likely restate its
> historical financial statements. What we could not predict is that 85
> days after the late filing, Perrigo would join the restatements club
> with a staggering $1 Billion restatement of net income.
>
> Since 2001, there have only been 19 restatements that exceeded the
> $1 Billion threshold.

*Perrigo Restates to Correct More than $1 Billion in Errors*, Audit Analysis (June 1, 2017),

http://www.auditanalytics.com/blog/perrigo-restates-to-correct-more-than-1-billion-in-errors/.

## V.    MISREPRESENTATIONS AND OMISSIONS MADE BY DEFENDANTS DURING THE RELEVANT PERIOD

### A.    Omega Integration and Overvaluation

152.    In the April 21, 2015 investor presentation discussed above, Perrigo and Papa

assured investors that the Omega acquisition "is accretive to Perrigo's organic growth profile,

and creates additional value derived from synergies and increased global scale." Presentation

slides explained that the "directors of Perrigo accept responsibility for the information contained

in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have

taken all reasonable care to ensure such is the case), the information contained in this

presentation is in accordance with the facts and does not omit anything likely to affect the import

of such information." Ex. 99.2 to April 21, 2015 Form 8-K, Slide 1. Defendants Perrigo and Papa

also orally stated:

> At Omega, we feel very good about the opportunity with Omega
> and specifically what I would refer to and we've talked about in
> the past about revenue synergies. We do believe that there are
> revenue synergies with the product portfolio that we have at
> Perrigo as we bring the 3,000 Perrigo products and help to bring
> them to Omega and look for ways that we could do line extensions

of existing Omega brands. That's something that we have teams underway already from an integration process. Those teams are very active in looking at which ones are the best ones to do, the earliest ones to do and move that forward. We do believe that that will allow us with the Omega portfolio to be in that 5% to 10% compound annual growth rate. Obviously, the more success we have with Omega, the more it would help us to be at the higher end of that from the revenue synergies point of view.

153.    In response to an analyst question during the April 21, 2015 investor presentation,

Defendants Perrigo and Papa went even further, stating:

> Q - **David R. Risinger-MORGAN STANLEY -ANALYST**: Many of my questions have been asked. I just wanted to ask about Omega though. So, I was hoping that you might be able to characterize the recent organic growth of Omega. Obviously, we don't have access to that. And also, maybe discuss what you're assuming for Omega organic growth ex-currency over the next three quarters that's baked into your guidance for 2015? I just want to get a sense for the momentum of that business on a stand-alone basis.
>
> A - **Joseph C. Papa**: Sure. Well, I will start with Omega. ***We're very pleased with our initial integration projects with Omega, so there is a lot of good activities happening with the integration team.*** I'd say it's focused on both driving that topline numbers to put your question but it's also focused on improving the cost of goods sold. We've got a supply chain team already working with them to drive the bottom line results as well. ***As I talk about the growth of Omega from a historical point of view moving into the future, it has been accretive to our growth rate. So, we're excited about that.***

154.    The statements identified in paragraphs 152 and 153 were materially false and

misleading when made because: (a) the Defendants had not "taken all reasonable care" to ensure

that the characterization of Omega's organic growth prospects, synergies, and integration was "in

accordance with the facts and does not omit anything likely to affect the import of such

information," and, as a result, the presentation ***did*** omit material facts; (b) Omega was not

accretive to Perrigo's claimed organic growth rate; (c) the presentation omitted there were

serious impediments to integration, including technological disparities, the decentralized

structure of Omega, management resistance, and regulatory hurdles; and (d) the presentation

omitted that Omega was already underperforming.

155.    On May 6, 2015, in response to an analyst's request for "highlights . . . about

Omega," Defendant Papa explained that one of the key sources of the "tremendous revenue

synergies" would be generated through substituting Omega's outsourced manufacturing with

Perrigo's in-house manufacturing capabilities. According to Papa:

> [O]ne of the things Omega did really well was sales marketing.
> One of the things they, by their own admission, say they were not
> focused on was the supply chain and manufacturing. We think we
> can help them tremendously with that. We've already got over 20
> projects, identified staff to lower the cost of goods of the Omega
> product. I remind you that 79% of what Omega sells today, they
> outsource. Some of those products we can bring into a Perrigo
> facility or an Omega facility with our expertise, and lower the cost
> of goods by 30-40%, which will absolutely add to the bottom line
> of Omega and Perrigo."

156.    The statements identified in paragraph 155 were materially false and misleading

when made because they omitted the following information necessary to make the statements not

misleading under the circumstances in which they were made: (a) that EU regulatory hurdles

would not allow Perrigo to simply transfer the 79% of supply outsourced by Omega to Perrigo's

U.S.-based manufacturing facilities, and Omega lacked the manufacturing facilities to satisfy this

supply; and (b) there were serious, known impediments to the integration, including

technological disparities, the decentralized structure of Omega, and management resistance,

which undermined the synergies projected by Papa.

157.    On June 2, 2015, Defendants held a conference call for analysts and investors, in

which Perrigo, through Coucke, stated with respect to Omega:

> [W]e have achieved the success we see today through our unique
> and disciplined approach, and under the leadership of an
> exceptional management team that we have built here at Omega
> Pharma. Over the last three years as a private company, Omega

Pharma has optimized its commercial infrastructure to deliver superior results. First of all, we hired best-in-class management and a consumer-centric sales and marketing team with extensive OTC experience.

Secondly, we streamlined the operations and we instituted an efficient management structure with real, efficient, direct, short reporting lines between Omega Pharma leadership team and country management.

158.   The statements identified in paragraph 157 were materially false and misleading when made because: (a) Omega did not have an "exceptional management team" or "best-in-class management"; (b) Omega had not "optimized its commercial infrastructure"; and (c) Omega had not already "instituted an efficient management structure," but instead required thorough restructuring.

159.   On June 23, 2015, Defendants Perrigo and Brown attended the Oppenheimer Consumer Conference and stated as follows in response to an analyst question regarding the Omega integration:

> **Q:** I have observations on Omega integration and opportunities to get the Perrigo brands over to Europe....
>
> **A - Judy L. Brown:** Sure, great. I'm happy to talk about Omega. So Omega [P]harmaceuticals, a company that grew dramatically. Started in the mid-1990s by its founder who was a pharmacist and thought that there was a niche potential in the European over-the-counter pharma market of product lines that were potentially not being well served by big pharma, and continued to acquire small brands and build them together over the course of many years. ***Bought many smaller companies. Built them together, created infrastructure, which is what made the asset incredibly appealing for us at Perrigo was we had aspirations of growing internationally, but didn't have a distribution footprint***. So as I mentioned earlier, part of the strength of our business model in the U.S. is that we have a truck rolling to pretty much every chain store, every large grocery store in the United States. We can reach everyone and we reach them almost on the daily basis. We did not have that infrastructure in Europe, but many, many hundreds of products that we eventually could sell if we had the infrastructure upon which to sell it.

- 72 -

Omega gave us that. 35 countries in Europe, many brands, distribution reach. What made it what we felt was a great marriage and what the seller felt was also a wonderful marriage was the combination of their commercial knowledge, their sales and marketing prowess, and their reach with our product and our supply-chain base.

*We closed the transaction on March 30, so we are about nine weeks in right now, and we are online – I should say in line with our going online integration process. Back office is working smoothly. We're bringing them onto all of our back-office systems, and importantly what was the underlying core of this deal was allowing Omega to remain independent in their sales and marketing process, not interfering with that but providing them product to put into that pipeline.*

So that will – that is a regulatory process. They have been making selections of products in certain countries that they want from our lineup and starting the regulatory processes that are required to get those new drugs approved in those new markets. And that is on track. And it is exciting for that team because in one fell swoop you have leading sales and marketing teams country by country being able to pick from a list of products that are relevant to and important for their patients and consumers locally. So, we are well underway.

160. The statements identified in paragraph 159 were materially false and misleading when made because: (a) the Company was not "in line" with its planned Omega integration process; (b) the back office integration was not "working smoothly"; (c) the statements omitted that there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance; and (d) the statements omitted that Omega was already underperforming.

161. On August 5, 2015, on a conference call held in connection with the Company's announcement of financial results for the second quarter of calendar year 2015, Defendants Papa and Perrigo made the following materially false and misleading statements:

Before we get into the agenda, however, I'd like to start by thanking Perrigo employees for their diligent focus[,] which has led to adjusted net income growth of 37%. Even with all the noise

you have been following over the past few months, our nearly 13,000 Perrigo employees have announced three M&A transactions, **delivered on our Omega integration plan**, achieved great operational efficiencies and productivity improvement, executed on our new product launches, and delivered on our Base Plus Plus Plus strategy. It's great work by the team.

162.    The statements identified in paragraph 161 were materially false and misleading when made, because: (a) Perrigo's employees had not "delivered on [the] Omega integration plan"; (b) the statements omitted that there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance; and (c) the statements omitted that Omega was already underperforming.

163.    On September 17, 2015, Perrigo, Papa and Perrigo's directors issued a letter to investors urging them to reject Mylan's tender offer. The letter trumpeted that since 2007, "we **have successfully integrated 27 acquisitions** with trailing 12-month net sales of more than $3.2 billion, all while maintaining our relentless focus on return on invested capital. Simply stated, Perrigo has an outstanding track record of value creation and our future is bright." The letter further stated that "[t]he directors of Perrigo accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

164.    The statements identified in paragraph 163 were materially false and misleading when made because they misstated and/or omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) the Defendants had not "taken all reasonable care" to ensure that the descriptions of Perrigo's record

of integrating acquisitions and value creation was "in accordance with the facts and does not omit anything likely to affect the import of such information," and as a result the letter did omit material facts; (b) the letter omitted that Perrigo had not successfully integrated its largest acquisition, Omega; (c) the letter omitted that Omega's senior executives had already warned Perrigo, Papa and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; and (d) the letter omitted that Perrigo had not created value for shareholders by the Omega acquisition.

165.    On the same day, Defendant Papa stated in his first public address to investors after Mylan's tender offer opened, during which he explicitly and repeatedly attacked the Mylan offer as "dilutive," that:

> We supplemented [Omega] with our manufacturing infrastructure so that we can-- one of the clear synergies we saw is that we-- Omega was manufacturing only about 23% of what they were selling. The other 77% was from outside their company. We said, we can bring some of that back into our business, into the Perrigo infrastructure, lower the cost of goods sold, and drive that to the bottom.

166.    The statements identified in paragraph 165 were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) Omega's senior executives had already warned Perrigo, Papa and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; (b) there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance; and (c) that Omega was already underperforming.

167.    On October 22, 2015, to justify its inflated profit forecasts for calendar years 2015 and 2016, Perrigo and Papa indicated they assumed: (a) that 2016 net sales for the BCH (Omega) segment would grow in the middle of the 5%-10% guidance they had previously published; and (b) that the "*integration and realization of synergies in relation to the acquisition of, Omega Pharma* . . . will proceed as planned and will not be subject to unforeseen material delays." Perrigo and Papa further represented that these assumptions were *"compiled with scrupulous care, accuracy and objectivity by the directors."*

168.    The statements identified in paragraph 167 above were materially false and misleading when made because: (a) the Defendants had not compiled the assumptions regarding BCH net sales, integration of Omega, and realization of synergies with "scrupulous care, accuracy and objectivity"; (b) the statements omitted that Omega's senior executives had already warned Perrigo, Papa and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; (c) the statements omitted that there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance; (d) the statements omitted that Omega was already underperforming; and (e) the statements omitted that Omega management had actually modeled Omega's organic growth rate between 2013-2017 to be only 3.2% per year, not the 5%-10% range touted to investors.

169.    Even after the Mylan tender offer had been thwarted, and on the cusp of announcing "restructuring" and the first impairment charges related to Omega, Defendants continued to tout the ability to "leverage" synergies from Omega. For example, during a presentation to investors on January 5, 2016, Defendant Papa was asked by an analyst "how are

you . . . getting that revenue synergy? . . . How are you leveraging Omega across Perrigo?" In response, Papa stated:

> [W]e felt there would be revenue synergies of $100 million-plus and cost-of- goods-sold synergies in the order of magnitude of the $25 million range. We still feel very good about those -- certainly on the cost-of-goods-sold synergies. We clearly are seeing projects in place that are going to generate far superior to $25 million just by simply either bringing some of the products that were outsourcing inside and/or things that we are doing just to leverage the Perrigo supply chain to get better raw material costs. So we feel very good about that.

170.   The statements identified in paragraph 169 were materially false and misleading when made because the statements omitted that Omega's senior executives had already warned Perrigo, Papa and Brown that this claimed synergy —that Perrigo would be able to substitute Omega's existing contract manufacturers with its own manufacturing capacity— would be extremely difficult to "leverage" due to regulatory impediments.

**B.    Inflated Organic Growth Claims**

171.   Beginning on April 21, 2015, in a concerted effort to persuade Perrigo investors to reject Mylan's $205 per share cash and stock acquisition offer, Defendants repeatedly made false claims regarding Perrigo's organic growth. On that date, Perrigo and Papa issued a press release stating, *inter alia*, that:

> Following a thorough review, advised by its financial and legal advisors, the Board unanimously concluded that the Proposal substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders.
>
> Key factors informing the Board's determination include:
>
> • The Proposal substantially undervalues Perrigo's differentiated global business, including the Company's leading market position in key franchises, global distribution platform, and proven expertise in product development and supply chain management;

- ***The Proposal would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy, which is reflected in the Company's three-year organic net sales compound annual growth rate (CAGR) goal for calendar 2014 to 2017 of 5-10%;***

*** 

Joseph C. Papa, Chairman, President and CEO, said, "***The Board believes the Proposal substantially undervalues Perrigo and its growth prospects and that continued execution by the management team against our global growth strategy will deliver superior shareholder value. Perrigo has a long history of driving above market shareholder value through consistent growth with a focus on profitability and operational excellence, which is reflected in our organic net sales CAGR goal of 5-10% for the next three years. . . . We will continue to capitalize on our durable competitive position by expanding our international platform organically*** and through future synergistic deals. These actions will advance our leadership in the global OTC marketplace."

Defendant Papa expressly took responsibility for the contents and accuracy of the April 21, 2015 press release. The press release stated "The directors of Perrigo accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the directors of Perrigo or Mylan (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

172. The statements identified in paragraph 171 were materially false and misleading when made because: (a) Perrigo's organic growth was not "consistent"; (b) the Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information," and as a result the press release did omit material facts; (c) the statements omitted that over the six quarters preceding the Relevant Period, Perrigo's

actual average organic growth was far below 5-10%; (d) the statements omitted that Omega management modeled Omega's long-term organic growth to be substantially below the 5-10% range referenced in the press release; (e) the statements omitted that the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (f) the statements omitted that Perrigo relied on the unsustainable and undisclosed sales practices Perrigo internally referred to as "optimizing" to achieve the growth it touted and projected; (g) the statements omitted that the Company had failed to integrate Omega operationally, a failure that would compromise the organic growth figures Defendants touted to investors; and (h) the statements omitted that certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections Defendants were touting to investors.

173.     Also on April 21, 2015, Defendants made a presentation to investors attempting to justify their rejection of the lucrative Mylan offer. Presentation slides stated: "The directors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information." During the presentation, Defendants Perrigo and Papa (on behalf of all Perrigo's directors at the time) stated as follows:

> Simply put, the Board believes that continued execution by the management team against our existing global growth strategy will deliver superior shareholder value. ***Perrigo has a long history of driving shareholder value through consistent, above-market growth and we are exceptionally well positioned to continue to***

*deliver superior growth and shareholder value as we build our strong independent future.*

\*\*\*

We're just back from the board meeting in Ireland and I'm thrilled to talk to you about our future growth prospects *which gives me great confidence that our strong durable base will enable us to achieve our goal to grow our net sales by 5% to 10% into the future.* We continue to grow at this rate on a significantly bigger base, but there is a significant potential upside not included in the CAGR goal. *To reiterate this, our growth goal is purely organic. We have historically delivered a balanced mix of organic and inorganic growth, which we expect to continue into the future.* We also see substantial upside for Perrigo on the horizon over and above this three-year goal.

\*\*\*

It's a very exciting chapter in the Perrigo growth story. We've built a tremendous platform for growth and value creation and our pipeline is stronger than ever. Plus, we are positioned to benefit from clear demographic trends and the movement of products from Rx to OTC. Plus, *we have just completed the Omega acquisition, which, among other major benefits, provides a significantly enhanced international platform for additional growth.*

174.    The statements identified in paragraph 173 were materially false and misleading when made because: (a) Perrigo was not "exceptionally well positioned to continue to deliver superior growth"; (b) Perrigo did not have a "strong durable base" capable of delivering 5-10% "purely organic" growth; (c) the Omega acquisition did not "significantly enhance[]" Perrigo's claimed organic growth rates; (d) Perrigo's growth prospects and competitive position were not accurately described and the Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (e) the statements omitted that Omega management modeled Omega's long-term organic growth to be substantially below the 5-10% range referenced in the press release; (f) the statements omitted

that the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (g) the statements omitted that Perrigo relied on the unsustainable and undisclosed sales practices Perrigo internally referred to as "optimizing" to achieve the growth it touted and projected; (h) the statements omitted that the Company had failed to integrate Omega operationally, a failure that would compromise the organic growth figures Defendants touted to investors; (i) the statements omitted that certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections Defendants were touting to investors; and (j) Omega management modeled Omega's long-term organic growth to be substantially below the 5-10% range referenced in the presentation.

175.    During the April 21, 2015 investor presentation, Defendants Perrigo and Brown utilized slides claiming (in relevant part) to establish Perrigo's "Proven Financial Track Record," "[a] proven history of meeting our goals," and "the ability to keep delivering":

## Proven Financial Track Record — Perrigo

A proven history of meeting our goals…

| | Fiscal Year 2011-2014 3YR CAGR* (Organic Net Sales) | Organic Net Sales CAGR Goal** | |
| --- | --- | --- | --- |
| | | Low | High |
| CHC Segment | ✓ 6% | 5% | 10% |
| Rx Segment | ✓ 22% | 8% | 12% |
| Nutritionals Segment | ✗ 3% | 5% | 10% |
| Consolidated Perrigo | ✓ 7% | 5% | 10% |

---

… and the ability to keep delivering

| | Calendar Year 2014-2017 3YR CAGR Goal (Organic Net Sales) |
|---|---|
| **Consolidated Perrigo** | **5-10%** |

Brown, on behalf of Perrigo and Papa, stated:

> ***The durability of our diverse product portfolio is clearly evident, as our consolidated result is solidly in the range. We have met our consolidated organic-only goals in the past and fully intend to do so in the future.*** Looking forward, our goal is to once again deliver an organic net sales CAGR for the next three years in the 5% to 10% range while off a significantly larger base.

176.    The statements identified in paragraph 175 were materially false and misleading when made because: (a) Perrigo did not have the "ability to keep delivering" organic net sales growth of 5-10%, and had not had that ability for several quarters; (b) the information presented in these slides and Defendant Brown's discussion of growth was not "in accordance of the facts" as Papa and Perrigo's other directors had promised, and the presentation did omit material facts "likely to affect the import of the information presented"; (c) the presentation omitted that over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5- 10%, not "solidly in the range."

177.    On May 6, 2015, Defendants Perrigo and Papa attended the Deutsche Bank Health Care Conference, and stated the following:

> We believe we have a business that will grow 5% to 10%, organically. So, we believe we can grow revenue 5% to 10% organically in our base business.

\*\*\*

But the final point, I guess, I want to make is that, in the meantime, the Perrigo Company is number one, going to continue to execute on our base business. We think we can execute as we said with the 5% to 10% compound annual growth rate over the three years organically.

\*\*\*

What we've always said is, what's most important for us is to continue to execute on our business, show that 5% to 10% compound annual growth rate.

Historically, what we've been able to do is actually we've done right in the middle of that. We've done about 8% compound annual growth rate organically. And then we supplemented that with another approximately 7% to 8% of inorganic opportunity. Those were the things we're going to continue to do. And that's why I think the board is very comfortable in stating that we felt the Mylan offer substantially undervalues the company.

178.    The statements identified in paragraph 177 were materially false and misleading when made because: (a) they omitted that over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5-10%; and (b) they omitted that at the time of the statements, Perrigo was *failing* to achieve organic growth goals and employing unsustainable sales practices to maintain the illusion of organic growth, and therefore "continu[ing] to execute" at the current rate would necessarily mean missing the growth targets touted to investors as a reason to reject Mylan's lucrative takeover offer.

179.    On May 12, 2015, Defendants Perrigo and Papa attended the Bank of America Merrill Lynch Health Care Conference and stated:

I think the biggest challenge we have right now is that we just don't see the offer that's on the table as being equivalent to what we think the value of the Perrigo Company is. So we think it substantially undervalues the Company. Given that, what's incumbent upon on me and the Board of the Company and the executive committee is make sure we continue to focus on driving the business, making sure that we continue to deliver on the 5% to

- 83 -

10% compound annual growth rate, continue to deliver on really
the bottom line.

180.    The statements identified in paragraph 179 were materially false and misleading
when made because (a) Perrigo was not then "deliver[ing] on the 5% to 10% compound
[organic] annual growth rate," and therefore could not "continue to deliver" that rate; and (b) the
statements omitted that over the six quarters preceding the Relevant Period, Perrigo's actual
average organic growth was far below 5% to 10%.

181.    On June 2, 2015, Defendants Perrigo and Papa attended the Jefferies Global
Health Care Conference and stated: "[H]istorically, Perrigo has grown by about 5% to 10%
annually. Specifically, it has grown about 8% organically. And we've grown about 8%
inorganically on an annual basis." These statements were materially false and misleading when
made because they omitted that Perrigo's actual average organic growth during the six quarters
preceding the Relevant Period was far below 5% to 10%.

182.    On August 5, 2015, Perrigo issued a press release announcing Perrigo's earnings
for the second quarter of calendar year 2015. Like other releases during the Mylan offer period,
the August 5, 2015 press release stated: "The directors of Perrigo accept responsibility for the
information contained in this announcement. To the best of the knowledge and belief of the
directors of Perrigo (who have taken all reasonable care to ensure such is the case), the
information contained in this announcement is in accordance with the facts and does not omit
anything likely to affect the import of such information." The press release quotes Defendants
Perrigo and Papa as stating "[o]ur durable business model and future growth prospects are self-
evident as we continue to progress on our stand-alone strategy."

183.    The statements identified in paragraph 182 were materially false and misleading
when made because: (a) Perrigo's purportedly "self-evident" future growth was based upon

fanciful assumptions and greatly exaggerated; (b) Perrigo's growth prospects and competitive position were not accurately described and the Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information," and as a result, Perrigo's press release *did* omit material facts; (c) the statements omitted that over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5-10%; (d) the statements omitted that the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (e) the statements omitted that Perrigo relied on the unsustainable and undisclosed sales practices Perrigo internally referred to as "optimizing" to achieve the growth it touted and projected; (f) the statements omitted that the Company had failed to integrate Omega operationally, a failure that would compromise the organic growth figures Defendants touted to investors; and (g) the statements omitted that certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections Defendants were touting to investors.

184.    On August 6, 2015, in conjunction with the presentation of financial results for the third calendar quarter of 2015, Defendants made a presentation to investors which claimed that they had a "[c]lear strategy for delivering 5%-10% organic growth" as well as "[m]ultiple avenues for additional upside." This presentation also assured that: "The directors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure

such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

185.    The statements identified in paragraph 184 were materially false and misleading when made because: (a) Perrigo did not have a clear strategy for delivering 5%-10% organic growth; (b) Perrigo's growth prospects and competitive position were not accurately described and the Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (c) the statements omitted that Perrigo's actual organic growth rate during the most recent eight quarters averaged well below the referenced 5%-10% range; and (d) the statements omitted that organic growth was threatened by known impediments to the Omega integration, by dependence on unsustainable sales practices, and by the increasing difficulty in replicating supracompetitive price hikes in the Generic Rx division.

186.    On September 17, 2015, Defendants Perrigo and Papa issued a letter urging shareholders to reject Mylan's offer, which it also filed with the SEC on Schedule 14D-9. Among other claims, the letter stated:

> After consideration of Mylan's offer, our Board of Directors unanimously concluded that the offer substantially undervalues the strength of Perrigo's business, operations, and future growth opportunities. ***We are confident in our 5- 10% three-year organic revenue CAGR goal, as executed historically, and we expect to meet our financial targets in the years to come, creating value for you well in excess of Mylan's offer, and with less risk.***

The SEC filing further explained Perrigo's reason for rejecting Mylan's above-market offer as follows:

> *Perrigo has demonstrated a reliable ability to grow organically.* Perrigo has grown organic net sales at a 6% CAGR since fiscal 2008, and the Perrigo Board expects that by continuing its leading

market position, Perrigo's durable global base business will continue this trend and realize an organic net sales CAGR goal of 5-10% over the next three years.

An appendix to the filing stated:

### 1. RESPONSIBILITY

1.1 **The Directors of Perrigo, whose names are set out in paragraph 2 below, accept responsibility for the information contained in this document**, save that the only responsibility accepted by the Directors of Perrigo in respect of the information in this document relating to Mylan, the Mylan group, the board of directors of Mylan and the persons connected with them, which has been compiled from published sources, has been to ensure that such information has been correctly and fairly reproduced or presented (and no steps have been taken by the Directors of Perrigo to verify this information). To the best of the knowledge and belief of the Directors of Perrigo (having taken all reasonable care to ensure that such is the case), the information contained in this document for which they accept responsibility is in accordance with the facts and does not omit anything likely to affect the import of such information.

187.     The statements identified in paragraph 186 were materially false and misleading when made because: (a) the rejection of Mylan's offer urged by Defendants increased, not reduced, risk, as it encouraged investors to squander an offer at a significant premium to Perrigo market price at the time; (b) Perrigo's growth prospects and competitive position were not accurately described and the Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (c) the statements omitted that Perrigo's actual organic growth rate during the most recent eight quarters averaged well below the referenced 5%-10% range; and (d) the statements omitted that organic growth was threatened by known impediments to the Omega integration, by dependence on unsustainable sales practices, and by the increasing difficulty in replicating supracompetitive price hikes in the Generic Rx division.

188.    Also on September 17, 2015, Defendants Perrigo and Papa attended the Morgan

Stanley Global Healthcare Conference and stated:

> *We try to focus on quality, affordable healthcare. And for us that's been a big driver of our average growth rate of somewhere around 5% to 10% organic.*
>
> ***
>
> *Our goal is to continue to drive organically 5% to 10% growth rate.* On top of that, we'll look to do additional M&A to get another 5% to 10%. So that the revenue side will grow, and that, let's call it 10% plus, and then grow the bottom line even faster. That's how we structure the business and that's why we think we've got a great opportunity for the future.

189.    The statements identified in paragraph 188 were materially false and misleading

when made because they omitted: (a) that Perrigo's actual organic growth rate during the most

recent eight quarters averaged well below the referenced 5%-10% range; and (b) that organic

growth was threatened by known impediments to the Omega integration, by dependence on

unsustainable sales practices, and by the increasing difficulty in replicating supracompetitive

price hikes in the Generic Rx division.

190.    On October 22, 2015, Defendants amplified their misrepresentations regarding

organic growth, and issued materially false and misleading profit forecasts for both 2015 and

2016. After issuing third quarter calendar year financial results, Defendants put on a presentation

projecting that Perrigo would earn $7.65-$7.85 for calendar year 2015, and that in 2016 it would

"Accelerat[e] Shareholder Value" and "Amplify[] Perrigo's Earnings Power," delivering a

baseline earnings per share of $9.30, increasing to $9.83 after including the effects of a planned

share repurchase and "optimization actions." *See* Presentation Slides, attached as Ex. 99.3 to

Form 8-K filed by Perrigo on October 22. To reach these lofty goals, Perrigo issued "CY2016

Revenue Guidance" incorporating organic growth assumptions of 5%-10% overall, 5%-10% in branded healthcare (former Omega), and 8%-12% in Generic Rx.

191.    Perrigo and Papa stated as follows with respect to the October 22, 2015 investor presentation: "The directors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information." Additionally, Perrigo and Papa indicated that the guidance for calendar years 2015 and 2016 constituted "profit forecasts" under Rule 28.1 of the Irish Takeover Rules. This statement was intended to, and did, assure investors that the Company had compiled the profit forecasts *and* "the assumptions upon which [they are] based" using "*scrupulous care, accuracy and objectivity by the directors*."

192.    In a separate letter to investors, Perrigo and Papa identified the assumptions they employed to calculate the 2015 and 2016 profit forecasts:

> **Assumptions**
>
> The Perrigo Directors have prepared the Profit Forecast on the basis of the following assumptions:
>
> **Factors outside the influence or control of the Perrigo Directors**
>
> - There will be no changes in regulation which would impact the Company's ability to price prescription products.
>
> - There will be no changes in general trading conditions, economic conditions, competitive environment or levels of demand, in the countries in which Perrigo operates or trades which would materially affect Perrigo's business.
>
> - There will be no business interruptions that materially affect Perrigo, its major suppliers or major customers by

reason of technological faults, natural disasters, industrial disruption, civil disturbance or government action.

- There will be no material changes in the price of raw materials, freight, energy, and labor costs from the prices and costs in place at the date of this profit forecast.

- There will be no material changes in exchange rates, interest rates, bases and rates of taxes, and legislative or regulatory requirements which would have a material impact on Perrigo.

- There will be no material adverse events that affect Perrigo's key products, including, competition from new generic variants, product recalls, product liability claims or discovery of previously unknown side effects.

**Other than the impact of the factors above, the Profit Forecast assumes the following factors within the Directors Influence and Control**

- Fourth quarter 2015 net sales for the CHC, BCH, Rx and Specialty Sciences segments are assumed to grow in line with the growth rates achieved 2015 year-to-date.

- The 2016 net sales for CHC, BCH and Rx segments are forecasted to grow organically in the middle of the three year compounded annual growth rate ranges published and disclosed to investors in the October 22, 2015 earnings release presentation. The ranges published and disclosed in April 2015 forecasted compounded annual growth of 5% - 10% for the CHC and BCH segments and 8% - 12% for the Rx segment.

- ***The integration and realization of synergies in relation to the acquisition of, Omega Pharma, certain branded consumer healthcare products from GSK, and Yokebe will proceed as planned and will not be subject to unforeseen material delays.***

- The forecast only includes those acquisitions closed or announced on or prior to October 22, 2015 and does not include any additional acquisitions, dispositions, partnerships, in-license transactions, or any changes to Perrigo's existing capital structure or business model after October 22, 2015.

- Adjusted operating margin is forecasted to remain consistent in 2016 when compared to 2015 and average ~28% of net sales.

- Interest rates underlying Perrigo's variable rate debt instruments will not vary significantly from the spot rates in effect as of October 22, 2015.

- The announced restructuring activities will proceed as planned and will not be subject to unforeseen material delays.

- The adjusted effective tax rate for the year ended December 31, 2016 is estimated at 14%-15% assuming a jurisdictional mix of incomes in line with the Company's current operations and the implementation of the actions announced on October 22, 2015.

- Other than the Share Buyback Program, there will be no material share repurchases, or issuances, in determining weighted average number of diluted shares.

193.    The statements identified in paragraphs 190 through 192 were materially false and misleading when made because: (a) Perrigo's growth prospects and competitive position were not accurately described and the Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (b) Perrigo's profit forecasts for calendar years 2015 and 2016 were not prepared with "scrupulous care, accuracy and objectivity"; (c) the assumptions underpinning Perrigo's profit forecasts for calendar years 2015 and 2016 were not prepared with "scrupulous care, accuracy and objectivity," especially the assumptions regarding 2016 organic net sales growth, of unchanged "competitive environment," the assumption that unsustainable sales practices would continue unabated, and the assumption that the Omega integration and synergies "will proceed as planned"; (d) the statements omitted that Perrigo's actual organic growth rate during most recent eight quarters was well below 7.5%—the organic growth rate that Directors assumed for 2016;

(e) the statements omitted that Perrigo's actual organic growth rate during the most recent eight quarters averaged substantially below the range of 5%-10% issued as guidance for 2016; (f) the statements omitted that Perrigo's "competitive environment" was already changing, as the anti-competitive pricing activities used to boost its overall income and the results of its Generic Rx division were already coming under scrutiny; and (g) the profit forecasts for both periods failed to properly account for the deterioration in the fair value of Perrigo's largest financial asset, the Tysabri royalty stream, or the effect of fair value mark-to- market charges on Perrigo's earnings.

194.     On January 11, 2016, Perrigo issued a press release increasing its 2016 earnings per share guidance to a range of $9.50-$10.10, to adjust for share repurchases announced during the Mylan offer period, and for two accretive acquisitions that Perrigo closed in December 2015. Papa stated:

> We enter 2016 excited about the prospects for our durable business model and plan for growth. We expect to launch greater than $1.2 billion in new products over the next three years, including products on our European branded platform. We have the deepest Rx pipeline in our history and are excited about the quality of our M&A pipeline. For these reasons, we remain confident in our ability to deliver on our 2016 growth targets.

195.     The statements identified in paragraph 194 were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) that Perrigo's "growth targets" had been prepared using assumptions of organic growth that Perrigo had failed to meet for most of the prior eight quarters; (b) that the competitive environment was already changing in the division contributing more than any other to Perrigo's bottom line, Generic Rx, as regulators and private litigants began to focus on the anticompetitive activities used to inflate results in that division; and (c) that the EPS forecast failed to properly account for the deterioration in the fair

value of Perrigo's largest financial asset, the Tysabri royalty stream, or the effect of fair value

mark-to-market charges on Perrigo's earnings.

### C.   Pricing Pressure and Anti-Competitive Pricing Practices in Generic Rx Division

196.   In the April 21, 2015 investor presentation discussed above, Perrigo and Papa

projected 8%-12% net sales growth for the Generic Rx division. Presentation slides explained

that the "directors of Perrigo accept responsibility for the information contained in this

presentation. To the best of the knowledge and belief of the directors (who have taken all

reasonable care to ensure such is the case) the information contained in this presentation is in

accordance with the facts and does not omit anything likely to affect the import of such

information." Ex. 99.2 to April 21, 2015 Form 8-K, Slide 1. Defendants Perrigo and Papa also

orally stated:

> On the question of pricing,… our goal on pricing has been the
> same goal, really for all the time, almost nine years I've been at
> Perrigo. What we seek to do on our pricing is keep pricing flat to
> up slightly and I'm very comfortable that, certainly in our current
> year in our calendar 2015, as we look to the future, we can keep
> pricing flat to up slightly. So that's really what our goal has been.
> There is no doubt that there has been some continued wholesaler
> consolidation and buying group consolidation has occurred. We're
> working very closely with those customers. They are very
> important to our consumer business; obviously they are very
> important to our Rx business. So we continue to work very closely
> with all of them to continue to drive and talk about what we refer
> to as the Perrigo advantage and what [is] unique about us that
> allows us the help them to meet the needs of their customers or the
> consumers in the world. So clearly, we do think that that is
> something we can continue to drive.

197.   The statements identified in paragraph 196 were materially false and misleading

when made because: (a) Perrigo's pricing strategy in the Generic Rx division was not to "keep

pricing flat to up slightly," but rather to wildly increase pricing in select generic drugs where

they could fix the market price in collusion with competitors and/or join an existing price-fixing

conspiracy; (b) as discussed above, in reality pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into drug pricing; and (c) the Defendants had not "taken all reasonable care" to ensure that the description of Perrigo's generic drug pricing strategy and growth prospects was "in accordance with the facts and does not omit anything likely to affect the import of such information."

198.    On May 12, 2015, Defendants Perrigo and Papa attended the Bank of America Merrill Lynch Health Care Conference, and stated as follows:

> **Q – Unidentified Audience Member:** So you and IGE [Farben (a German pharmaceuticals conglomerate)] both have a [Rx] product that you both benefited from a price increase and recently you decreased price and IGE has made some comments as to what they think you are doing, but it seems to be there may be some [pricing strategy] you created around your Rx products to address a certain customer demand or go after a certain group of customers. I was wondering if you could just elaborate on what the strategy may be there?

> **A - Joseph C. Papa:** Sure. I'm not going to comment specifically on this particular product conflict or product opportunity. ***Obviously, it's a competitive market out there. There is always going to be – in a pricing world, somebody is going to gain some share, somebody is going to lose some share. I think, as a general rule, what I've tried to do with pricing at Perrigo in the eight years, nine years, I've been a part of the company is to keep pricing flat to up slightly.*** And if I do that, I believe that puts me in the best long-term position to deliver shareholder value for the Company. Any specific product conflict issue is just a normal part of give and take in terms of market share, gaining market share, losing market share. Right now as I sit here today, Perrigo is the leader in what I would call extended topical. So anything that's observed topically, dermatology, respiratory, nasal, ophthalmic, we've got a leading position there ***and I think we're just going to certainly try to continue to make good decisions on that pricing because I think as you've seen in our business, we've been able to drive some very significant growth both on the top-line and the bottom-line for the company relative to our operating margins in the mid-40%s.***

199.     The statements identified in paragraph 198 above were materially false and

misleading when made because: (a) Perrigo's pricing strategy in the Generic Rx division was not

to "keep pricing flat to up slightly," but rather to wildly increase pricing in select generic drugs

where they could fix the market price in collusion with competitors and/or join an existing price-

fixing conspiracy; (b) for many of Perrigo's generic drugs it was not a "competitive market," but

rather a market where natural competition was constrained by collusion; (c) as discussed above,

in reality pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of

increased market competition caused in large part by accelerated approvals of generic drug

applications by the FDA and U.S. regulatory scrutiny into drug pricing; and (d) it was not "good

decisions on that pricing," but rather massive price hikes accomplished through collusion which

could not possibly be replicated on an ongoing basis that were responsible for the inflated

operating margins in Perrigo's Generic Rx division.

200.     On June 2, 2015, Defendants Perrigo and Papa attended the Jefferies Global

Healthcare Conference and made the following materially false and misleading statements:

> **Q - David Steinberg – Jefferies & Co. - Analyst:** Moving to
> another business line, generics[.] In retrospect, the acquisition of
> Paddock several years ago was really a brilliant one, and your star
> performer in these last several quarters were generic drugs. As you
> look at the portfolio, I know you're reticent to raise price in store
> brands. But as you look at your portfolio, are there any pricing
> opportunities in some of your extended dermatologics? And
> secondly, with regards to M&A, what type of assets are you
> looking to bring in to augment your current generic portfolio?
>
> **A - Joseph C. Papa:** Sure. The approach we take on pricing is
> really a portfolio approach. I'm sure it's very similar to many of
> you in the audience, as you think about the individual stocks you
> buy. You take a portfolio view on what you're trying to
> accomplish. That's what we do on our pricing for our business.
>
> Across all the Perrigo segments, the consumer segment, the
> nutrition segments, the RX segment and the API segment; we try
> to take a view on pricing across that total portfolio with the goal of

keeping our pricing flat to up slightly. Now in any individual category, like Rx, there may be more upside. ***But we're recognizing that there is going to be some products in Rx that I'm going to have to decrease for competitive reasons, as well as increase some. So what we try to do is take a holistic view across the entire portfolio and keep pricing flat to up slightly.*** I will say over the last several years to be fair, there's been more pricing upside in the RX category than perhaps some of the other categories. But we still take that kind of total portfolio view of keeping pricing flat to up slightly as a view.

201.     The statements identified in paragraph 200 were materially false and misleading when made because: (a) Perrigo's policy with respect to pricing generic drugs was not to "keep[] . . . pricing flat to up slightly," but rather to inflate prices wildly on select generic drugs in collusion with other generic drug manufacturers; (b) the statements omitted that the "pricing upside in the RX category" over the last several years was the result of anti-competitive practices by Perrigo and other generics manufacturers; and (c) as discussed above, in reality pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into drug pricing.

202.     During the conference call on August 5, 2015, regarding second quarter calendar 2015 results, Defendants Perrigo and Papa made the following materially false and misleading statements:

> **Q - Marc Goodman – UBS - Analyst:** And third, in the generics business, just remind us of where we are in this price increase dynamic and how sustainable you feel like those increases are? Thanks.
>
> **A - Joseph C. Papa**: I'm going to go to your third part on generics and pricing and I'll go back to Judy for the second one. ***On the generics and the pricing environment, our team has done a great job at looking at pricing***. . . . Across that portfolio, ***we think there are still opportunities to do pricing***. We will continue to look at it. We think there's something that we'll be talking about in the future for pricing. But I think it really supports the strength of that

operating profit line of 49.5% and what we achieved with our Rx business in the quarter. And importantly, the gross profit line is 64.8%. For those reasons, we think we have got a strong Rx business and we look to still find some additional pricing opportunities for the future.

203.     The statements identified in paragraph 202 were materially false and misleading when made because they omitted that: (a) Perrigo's massive price increases on select drugs in its Generic Rx division were made in collusion with competitors and/or join an existing price-fixing conspiracy; (b) the "price increase dynamic" had changed and it had become more difficult to make similarly-sized price increases as the generic drug industry faced more scrutiny on pricing and collusion; (c) as discussed above, in reality pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into drug pricing; and (d) the pricing achieved in prior quarters in the Generic Rx division was not the result of a "great job" by Perrigo's team, but rather by collusion with competitors in violation of U.S. antitrust laws.

204.     On August 13, 2015, Perrigo filed an Annual Report on Form 10-K for the fiscal year ended June 27, 2015. The Annual Report was signed by the Individual Defendants and falsely stated that the Generic Rx division "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products."

205.     The statements identified in paragraph 204 were materially false and misleading when made because Perrigo's Generic Rx division did not operate in a "highly competitive environment" or face "vigorous competition" for many of its key products, but instead operated in an environment where prices had been fixed with other generic drug manufacturers at

artificially high prices to garner collusive revenues that would not be possible in a competitive market.

206.    On October 22, 2015, Perrigo held a conference call to announce calendar year 2015 third quarter financial results, in which Defendants Perrigo and Papa made the following materially false and misleading statements in response to an analyst question regarding generic drug pricing:

> **Q - Elliot Wilbur – Raymond James - Analyst**: And then maybe more importantly, obviously financial markets have become very concerned about the price inflation component of growth, both on the generic and brand side going forward. And certainly the generic topical business has been one of the few segments of generic industry that has really benefited from a strong overall pricing dynamic. And just thinking about 8% to 10% growth next year, how much do you think that is going to be driven by price? Or do you think we've kind of hit an inflection point maybe where growth metrics are going to be far less dependent on price and maybe we're looking at the potential negative impact on price going forward in that segment? Thanks.
>
> **A - Joseph C. Papa**: So I think, Elliot, you had about three or four things I want to comment on. . . .
>
> On the question on pricing, certainly, we see that out in the marketplace, but I would remind the audience today that what we've always said about pricing is that our pricing across our total book of business is flat to up slightly. While there may be a product that we do raise the price on, there are other products we're taking price down. Our total strategy for pricing, as I have said I think on numerous calls, is keep pricing flat to up slightly. Which means that yes, some products we may attempt to the raise price there, but in another products we're bringing the price down. So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio. ***Whether we are talking about any specific product or any specific category or any segment of our business, the overall comment is flat to up slightly for our pricing. And I think that's really the best place for the long, sustainable consistent approach to pricing that we've had in the past; we will in the future.***

207.     The statements identified in paragraph 206 were materially false and misleading when made because: (a) Perrigo's pricing strategy in the Generic Rx division was not to keep pricing "flat to up slightly," but rather to wildly increase pricing in select generic drugs where they could fix the market price in collusion with competitors and/or join an existing price-fixing conspiracy; (b) Perrigo's actual generic drug pricing strategy was not a "sustainable consistent approach"; (c) as discussed above, in reality pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into drug pricing; and (c) the statements omitted that the "strong overall pricing dynamic" that Perrigo enjoyed in its Generic Rx division, and that the analyst inquired about, was the result of anti-competitive price hikes which could not possibly be replicated on a continuing basis and, in reality, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition.

208.     On October 22, 2015, Perrigo and Papa issued inflated profit forecasts for calendar years 2015 and 2016. The investor presentation in which these profit forecasts were published to investors indicated that: "The directors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information." Additionally, Perrigo and Papa indicated that the guidance constituted "profit forecasts" under Rule 28.1 of the Irish Takeover Rules. This statement was intended to, and did, assure investors that the Company had compiled the profit forecasts and "the assumptions upon which [they are] based" using "scrupulous care,

accuracy and objectivity by the directors." Perrigo's profit forecasts guided investors to expect adjusted diluted earnings per share (EPS) of $7.65-$7.85 in calendar year 2015, and $9.30-$9.83 in calendar year 2016. In a letter attempting to justify this inflated model, Perrigo and Papa indicated that they assumed that 2016 net sales for the Generic Rx segment would grow organically in the middle of the 8%-12% guidance they had previously published, and that the "competitive environment" would not change.

209.    The statements identified in paragraph 208 were materially false and misleading when made, because: (a) the Defendants had not compiled the assumptions regarding Generic Rx division net sales, or the contribution of that division to Perrigo's earnings per share projection, with "scrupulous care, accuracy and objectivity"; and (b) the statements omitted that the strong generic drug pricing and profit margins Perrigo had enjoyed in 2014 and 2015 were the result of unsustainable collusion with competitors in violation of U.S. antitrust laws and pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition caused in large part by accelerated approvals of generic drug applications by the FDA.

210.    On January 5, 2016, Defendants Perrigo and Papa attended the Goldman Sachs Healthcare CEOs Conference and made the following materially false and misleading statements:

> **Q – Jami Rubin – Goldman Sachs - Analyst:** I want to touch upon your generic business because it has performed exceptionally well. But it also appears, Joe, that ***your business has benefited from a very positive pricing environment.*** I think you've acknowledged that. How much of the growth in your business has been driven by price? Have we hit an inflection point where growth metrics are going to be far less dependent on price? And what happens to growth if generic pricing turns negative? And our analyst Bob Jones is tracking prescription generic drug inflation and noting that it's turning into negative territory. I don't know how much of that is affecting your business, but I imagine eventually it will.

**A - Joseph C. Papa:** About [those] three questions or four questions, I will start with first one.

***

**A - Joseph C. Papa:** Number one, our goal—I've been at Perrigo nine years. My goal on pricing has been the same for the nine years: try to keep my pricing flat to up slightly. Now, to be clear, what that means is that I'm taking some products up, and some products can be competition and I'm taking them down. On balance, what I've tried to—what I strive very hard to achieve is what I would call pricing flat to up slightly.

Now, within a category like let's use the generic Rx products, there may be more volatility up or down in products. Certainly there's more than generics than there is in my consumer business. My consumer business has very minimal volatility. So that's what I've strived to accomplish.

Is there a place now as we sit here today that there's going to be less pricing? I think the answer really is—I'm a believer in economic theory. It all comes down to supply and demand. In other words, if there are five players, 10 players supplying drug, I can pretty much tell you what the price points are going to be. It's going to be your cost of goods plus 10%. It's going to find its way down to that level.

In a case where there's only two players or three players, it's—you're going to make better margins. And that's why we have purposely tried not to be in the commodity generics but to stay in the extended topicals.

Do I think the point of your question is is there going to be more price competition in even things like dermatology? Yes, I do because there are some people coming in.

211.   The statements identified in paragraph 210 were materially false and misleading when made because: (a) Perrigo's pricing strategy in the Generic Rx division was not to "keep pricing flat to up slightly," but rather to wildly increase pricing in select generic drugs where they could fix the market price in collusion with competitors and/or join an existing price-fixing conspiracy; (b) for many of its most important generic drugs, Perrigo's generic drug pricing did not just raise prices to "meet competition," but engaged in coordinated price hikes in collusion

- 101 -

with so-called competitors; and (c) the additional "price competition" in dermatological drugs referenced by Papa was not simply the result of "economic forces" of new competitors entering the market, but rather the increased scrutiny on anti-competitive practices in the generic drug industry, and the increased difficulty of replicating price increases in the face of such scrutiny.

212.    On February 18, 2016, Perrigo announced fourth quarter calendar year results and held a conference call, in which Defendants Papa and Brown made the following materially false and misleading statements:

> **Q - Elliot Wilbur – Raymond James - Analyst:** Thanks. Good morning. I'm sure there will be a lot of questions on BCH. Maybe I'll actually start off and ask a question on the Rx generics segment. Judy, if you have the numbers available, could you give us a sense of what the full-year contribution was from new products versus decline in the base? I'm just looking at fourth quarter and it looks like there's about a 10% rate of decline in the base, which maybe seems a little bit higher than average, which leads me into part of my question here. ***It just seems like at the margin certain segments within the generic area are seeing more pricing erosion, particularly dermatologics. I'm just wondering how you are thinking about potential head winds there in terms of accelerated pricing erosion in 2016.*** Obviously it's been a very strong tail wind the past couple of years. Thanks.
>
> **A - Joseph C. Papa:** Judy, why don't you take the first part of it and I'll take that latter part.
>
> **A - Judy L. Brown:** Were you to go through and accumulate the comments we made each quarter throughout calendar 2015 on new products and Rx, new products contributed approximately $121 million over the course of those four quarters. ***And pricing-wise, we did see some pressure, give or take, in the total portfolio over the course of the year approximately 1%.***
>
> **A - Joseph C. Papa:** And the latter part of your question, it really talks about the pricing dynamics and what we're thinking about and looking at for the future. And I'd say the following. Are there some increment product competition that we're going to face? The answer is yes.
>
> However, what we've tried to do at Perrigo Group is not just stay focused only on dermatology. As you know, we've moved into

what I refer to as extended topicals. So those are things beyond just certainly dermatology—but respiratory, nasal, ophthalmic.

And with those product categories -- for example, at the end of the year, we'll launch our ProAir product in terms of a meter-dosed inhaler for respiratory -- those are the things that are giving us great strength in our Rx category. ***And, as we believe, that will give us a very high gross margin and operating margin, certainly as we think about the 2016 and beyond.*** So, we like what we see in terms of our ability to launch these new products and what they mean for gross margins and operating margins.

213.    The statements identified in paragraph 212 were materially false and misleading when made because they omitted that: (a) the generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with so-called competitors; and (b) the pricing erosion and "incremental product competition" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers, and the increased difficulty of replicating price increases in the face of such scrutiny.

214.    On February 25, 2016, Perrigo filed a report on Form 10-KT for the fiscal six month stub period ending December 31, 2015. The Form 10-KT was signed by Papa and Brown and falsely stated that, as a manufacturer of generic versions of brand-name drugs, Perrigo "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products."

215.    The statements identified in paragraph 214 were materially false and misleading when made because Perrigo's Generic Rx division did not operate in a "highly competitive environment" or face "vigorous competition" for many of its key products, but instead operated in an environment where prices had been fixed with other generic drug manufacturers at

artificially high prices to garner collusive revenues that would not be possible in a competitive market.

### D.   Declining Fair Value of Tysabri Royalty Stream

216.   On April 29, 2015, Perrigo filed its Quarterly Report on Form 10-Q for the quarter ending March 28, 2015, which was signed by Defendants Papa and Brown. The April 29, 2015 Form 10-Q claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." The April 29, 2015 Form 10-Q stated that the Tysabri royalty stream was an "intangible asset," and that "[t]he asset's *value is $5.8 billion*, which is being amortized over a useful life of 20 years."

217.   The statements identified in paragraph 216 were materially false and misleading when made because: (a) the asset's value was not $5.8 billion; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (c) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

218.   On August 13, 2015, Perrigo filed its Annual Report on Form 10-K for the fiscal year ending June 27, 2015, which was signed by Papa and Brown. Like the April 29, 2015 Form 10-Q, the August 13, 2015 Form 10-K referenced GAAP compliance but did not disclose the fair value of the Tysabri royalty stream at the end of the fiscal year; instead, it likewise stated that that the asset had "a value of $5.8 billion and a useful life of 20 years."

219.    The statements identified in paragraph 218 were materially false and misleading when made because: (a) as the Company conceded in its restatement, the asset's value was not $5.8 billion, but rather was no more than $5.42 billion by June 27, 2015; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (c) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

220.    On October 22, 2015, Perrigo and Papa issued a press release announcing earnings for the third calendar quarter of 2015. The press release stated: "The directors of Perrigo accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

221.    The statements identified in paragraph 220 were materially false and misleading when made because: (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; (b) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to

sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met); and (c) the Defendants had not "taken all reasonable care" to ensure that the description of the Tysabri royalty stream was "in accordance with the facts and does not omit anything likely to affect the import of such information."

222.    On November 2, 2015, Perrigo filed its Quarterly Report on Form 10-Q for the quarter ending September 26, 2015, which was signed by Defendants Papa and Brown. The November 2, 2015 Form 10-Q claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." The November 2, 2015 Form 10-Q did not disclose the fair market value of the Tysabri royalty stream, or update prior statements claiming the asset's value to be $5.8 billion.

223.    The statements identified in paragraph 222 were materially false and misleading when made because they included the following misstatements and omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (b) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

224.    On January 5, 2016, Defendants Perrigo and Papa gave a presentation to investors at the Goldman Sachs Healthcare CEO's Conference, in which they were specifically asked about the Tysabri royalty stream, and stated:

**Q – Jamie Rubin – Goldman Sachs – Analyst:** Tysabri…gets less play because it's a path of royalty stream, but it's also a very important part of your earnings picture. I guess a two-part question: what is the strategic rationale of keeping this now? Obviously, it is important to your earnings, but you could also sell it.

And just curious to get your thoughts on your own internal outlook for Tysabri in light of new competition next year from Roche. And just looking at consensus estimates, it looks like the Street is modeling growth of about 8% per year. And just wondering how comfortable you are with that.

**A – Joseph C. Papa:** First and foremost, I'm going to say we think we've got a great partner with Tysabri and Biogen. And they've just done a great job with the product from day one. And we are really pleased with what they have done. And we think there's continued opportunity for more patients to move to what I would refer to as the highly effective category versus the Avadox, Betaseron, Copaxone (inaudible).

So we think the category of highly effective—especially when the introduction of new competition like Roche and other people are promoting is going to just expand that slice of the pie. So we feel very good about it.

225.     The statements identified in paragraph 224 were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) the Company had been reporting financial results that were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (b) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

226.     On February 22, 2016, Perrigo reported its financial results for the stub period between the end of its prior fiscal year and the end of calendar year 2015 on Form 10-KT, which was signed by Defendants Papa and Brown. The February 22, 2016 Form 10-KT referenced conformity with GAAP but did not disclose the fair market value of the Tysabri royalty stream at the end of the fiscal year; it instead again stated that that the asset had "a value of $5.8 billion and a useful life of 20 years."

227.     The statements identified in paragraph 226 were materially false and misleading when made because they included the following misstatements and omitted the following information necessary to make the statements not misleading in the circumstances in which they were made: (a) the Tysabri royalty stream did not have a value of $5.8 billion, but rather was worth no more than $5.31 billion as of December 31, 2015; (b) the financial statements in the Form 10-KT were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (c) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

## VI.     THE TRUTH IS REVEALED

228.     On February 18, 2016, after months of hyping its strong financial condition and prospects, Perrigo stunned investors by reporting fourth calendar quarter 2015 revenue, margins, earnings and cash flow that were all below what Defendants had led investors to expect. The Company also revised its 2016 earnings guidance downward from the guidance it issued and reiterated (with adjustments for recent acquisitions) just weeks earlier during the Mylan offer.

Most shockingly, however, the Company also revealed previously undisclosed problems regarding Omega. In contrast to earlier claims that Perrigo's team had already delivered on the Omega integration, Perrigo conceded it needed to restructure parts of the BCH unit containing Omega assets. The Company further admitted that it needed to record an impairment charge of $185 million because the carrying value of certain Omega assets exceeded their fair value.

229.    Analysts uniformly reacted harshly to the news, with reports by Deutsche Bank, Jefferies, J.P. Morgan, Leerink, Morgan Stanley, and UBS all describing the results as a "disappointment" and/or "disappointing." As a result of these disclosures, the price of Perrigo shares fell $14.77 per share from the close of the market on February 17, 2016, or over 10%, to close at $130.40 per share on February 18, 2016. The blow was softened because Defendants failed to reveal the full extent of their growth problems or Omega issues, and did not reveal at all the deteriorating fair market value of Tysabri or generic drug price collusion.

230.    On April 22, 2016, just after Defendant Papa collected millions of dollars in cash and equity bonuses for fending off the Mylan bid (*see* ¶133), Reuters and other news services reported that he would be leaving Perrigo to become the new CEO of Valeant. According to Reuters, Valeant was negotiating a contract with Papa and planned to announce his appointment as soon as the following week.

231.    UBS's analyst report addressed the bombshell news by stating simply: "We are surprised. We didn't see this coming." The news particularly disturbed the market given that Papa had spent the better part of the prior year assuring investors of his long-term vision and strategy for the Company. For example, Jefferies noted in its analyst report that, after investors had "heeded [Papa's] advice and voted against the [Mylan] tender," "the mere thought that [Papa would] consider a new role could lead one to conclude that [Perrigo] is far from being 'fixed'"

and "could imply more . . . [disappointing performance] to come." By the end of the day, the price of Perrigo shares had fallen $7.33 per share, or 5.7%, from $128.68 per share at the close on April 21, 2016, to $121.35 per share.

232.    Though Perrigo had initially issued a press release stating only that it would not comment on "speculation or market rumor," before the market opened on April 25, 2016—the very next business day—Perrigo confirmed Papa's resignation. Even worse, it also drastically lowered its earnings guidance for 2016 and announced weak preliminary first-quarter 2016 results. Specifically, Perrigo announced first-quarter 2016 earnings per share guidance of $1.71 to $1.77, compared with the $1.89 per share investors had been led to expect. The Company also again significantly lowered its 2016 earnings guidance, from the already reduced $9.50 to $9.80 per share announced in February down to only $8.20 to $8.60 per share, a decline of nearly 14%.

233.    In sharp contrast to Defendants' prior representations about the strength of Perrigo's competitive position and the success of the Omega acquisition, the Company attributed these poor financial results to increased competitive pressures in its prescription drug segment and weaker-than-expected performance within Omega. Even more surprisingly, Perrigo warned that investors should expect this weak performance to continue for at least the next three quarters. Perrigo also revealed that Omega impairment charges might grow even larger than the $185 million charge it had announced two months earlier.

234.    Market commentators and analysts immediately noted that these revelations contradicted Defendants' aggressive promotion of Perrigo's growth and prospects during the Mylan bid. For example, "Mad Money" host Jim Cramer stated that "Papa had come on 'Mad Money' and talked about how the Mylan bid dramatically undervalued Perrigo. . . . *That was*

*clearly untrue*." Cramer also noted his concern over Papa's decision to depart "under what is probably a terrible moment for Perrigo."

235.   Likewise, Wells Fargo downgraded Perrigo stock, noting that "Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid." A Barclays report stated that the news prompted "[n]o shortage of frustration . . . especially since the reset of expectations comes ~6 months after management convinced shareholders to rebuff [Mylan's] tender offer," and that "the circumstances around Papa's departure, so soon after fending off [Mylan] . . . left many investors concerned that [Perrigo] could be in worse shape than we supposed."

236.   As a result of these disclosures, Perrigo shares plummeted an astonishing 18% that day, dropping by $21.95 per share from the prior day's close and erasing $3.1 billion in market value following unusually high trading volume of over 30 million shares.

237.   On April 28, 2016, Perrigo issued a press release announcing that it had accepted Coucke's resignation. The release quotes Hendrickson as noting that "[a]ligned with the actions that we are taking to drive improved performance in the BCH segment, we have accepted the resignation of Marc Coucke."

238.   On May 12, 2016, Perrigo reported a disappointing first quarter 2016 loss of $0.93 per share (which the Company later revised to a loss of $2.34 per share). The Company largely attributed this loss to an additional $467 million impairment charge relating to the Omega acquisition, bringing Omega impairment charges to more than $650 million, only months after touting the success of the Omega acquisition to stave off Mylan's tender offer.

239.   In a conference call with investors later that same day, the Company's newly appointed CEO—John Hendrickson—stated that the Company's "recent track record of

performance against our own expectations is unacceptable," and also indicated that he would "try to be as transparent as possible" and target "realistic" forecasts that the Company can meet.

240.    The market took these statements as a clear admission that the Company and its former CEO had misled investors with unrealistic and unattainable financial goals to defeat Mylan's takeover during the prior year. For example, in its analyst report addressing these disclosures, Jefferies wrote that it was "looking forward to [Hendrickson's] 'realistic' and 'transparent' approach to running the business since now more than ever the co needs to meet expectations & *reestablish credibility*." Likewise, an analyst report by Barclays described the developments as Perrigo's new leadership team "'rethink[ing]' everything which is leading to more achievable targets." As a result, Perrigo shares fell an additional $3.71 per share, or 4%, from $92.75 at the close on May 11, 2016, to $89.04 at the close on May 12, 2016. Despite its promises of transparency, the Company did not come clean about the full extent of its deteriorating growth, the crumbling value of its largest asset, or its reliance on collusive pricing to generate profits for the Generic Rx division.

241.    On August 10, 2016, Perrigo announced that it was *yet again* revising its guidance in part because of lower performance expectations related to the Omega acquisition as it continued to implement "transformational organizational changes and improvements in products and process in this business." This news stunned the market, which began to question how Perrigo could have so drastically and continually misstated the benefits and integration of the Omega acquisition. For example, a RBC Capital Markets analyst report said Perrigo's guidance was only "now reasonable," while a UBS analyst report stated that it was "surprised that management did not plan for [Omega acquisition issues] in the last guidance change."

242.    Perrigo's August 10, 2016 earnings press release acknowledged that part of the shortfall was due to the beginning of the return of competitive pricing to the Generic Rx division, the natural result of increased scrutiny making collusive price hikes more difficult to implement: "To be clear, our financial results were below our expectations primarily due to competition and price erosion in the Rx business." The press release also stated: "Competition and price erosion impacted both reported gross margin and adjusted gross margin[.]" In a conference call that same day, Defendants Perrigo and Brown also attributed the shortfall partially to "price erosion" in the generics segment. As a result of the August 10, 2016 disclosures, Perrigo shares fell nearly another 10%, from $95.09 at the close on August 9, 2016, to $86.00 at the close on August 10, 2016, following unusually high trading volume of over 13.7 million shares. Shares dropped another 2.37% to close at $81.95 on December 8, 2016, after Perrigo announced that it had to entirely restructure the BCH (Omega) unit.

243.    On September 12, 2016, activist investor Starboard Value sent a letter to CEO Hendrickson and the Board of Directors, criticizing the false promises that were made to thwart the Mylan bid:

> In April 2015, Mylan N.V. ("Mylan") made an unsolicited proposal to acquire Perrigo for cash and stock worth approximately $205 per share, more than a 25% premium at that time. Even at current market prices for Mylan shares, this combination would have resulted in a current value of approximately $167 per share, or 88% more than the current Perrigo stock price of approximately $89. Management and the Board went to great lengths to oppose this proposed combination, spending more than $100 million in advisor fees relating to its defense, and promising shareholders that their standalone strategy would produce more value than the transaction given the robustness of Perrigo's future prospects. ***In order to convince Perrigo shareholders to reject Mylan's offer, management and the Board made aggressive promises of drastic improvements in both financial and stock price performance.***

*See* Starboard letter dated September 12, 2016. The Starboard letter also called out "multiple overly optimistic presentations by Perrigo management illustrating the potential future value of Perrigo shares," and the fact that "since that time, results have gone decidedly in the wrong direction, and management's promises have been woefully unfulfilled."

244.    On February 27, 2017, Perrigo announced that it had agreed to sell the Tysabri asset touted to investors at the beginning of the Relevant Period as having a "value of $5.8 billion," and which Defendants had never indicated was impaired, ***for only $2.2 billion cash*** (plus potential future payments of up to $0.65 billion). Perrigo also announced that, for the first time, the fair value of the royalty stream did not equal its carrying cost and it was therefore recording an impairment charge associated with the asset. Moreover, Perrigo stated that it was examining "historical revenue recognition practices" associated with the royalty stream and other potential accounting irregularities and, as a result, could not timely file its periodic reports with the SEC. Finally, Perrigo announced that Defendant Brown was unexpectedly leaving the Company. As CFO, Brown was the person most responsible for these accounting irregularities. Within months, the Company confirmed investors' fears, restating every single financial statement it had issued during the Relevant Period—an admission that those statements were materially false as of the time they were issued.

245.    As a result, the Company's shares closed down nearly 12%, or $9.91 per share, from $84.68 at the close on February 27 to $74.77 on February 28, 2017, on unusually high trading volume of over 14 million shares. A Morgan Stanley analyst report described the developments as a "Painful re-set" and explained that the pain was the result of inflated and unachievable organic growth targets: "Under previous CEO Joe Papa, Perrigo had targeted 5-10% . . . revenue growth, but the company did not achieve[] that level of growth in recent years."

Likewise, an RBC Capital Markets analyst report described the disclosures as "worse than we anticipated" and was concerned by the "***unexpected CFO departure***."

246.    On March 3, 2017, Bloomberg reported that Perrigo's name had been raised by antitrust regulators at the Department of Justice. *See Perrigo Joins Firms With Generic Drugs Under U.S. Glare*, Bloomberg (Mar. 3, 2017), https://www.bloomberg.com/news/articles/2017-03-03/perrigo-joins-list-of-firms-with-generic-drugs-under-u-s-glare. On this news, Perrigo shares dropped 3.71% to close at $72.76, from $75.56 at the close of the prior day.

247.    After the close of the market on May 2, 2017, Perrigo revealed that its offices had been raided as part of an ongoing investigation by the United States Department of Justice into price-fixing in the pharmaceutical industry. Investors were stunned. As a Wells Fargo analyst report noted, Perrigo had not "included a disclosure in its prior SEC filings related to an investigation." The raid was a far more severe measure than taken against most other generic drug manufacturers, who merely received subpoenas. Consequentially, on May 3, 2017—the last day of the Relevant Period—Perrigo's shares closed down over 5%, or $3.88 per share, from $76.23 at the close on May 2, 2017, to $72.35 on May 3, 2017. As one Seeking Alpha contributor recognized in an article entitled "Will Perrigo Collapse?" published shortly after the raid:

> Perrigo (NASDAQ:PRGO) stock has been bit by a U.S Justice Department investigation into price fixing and anti-competitive practices in the generics market. This controversy culminated in a federal raid on Perrigo's offices.
>
> ***
>
> Perrigo's 'roll up' business model is showing signs of stress.
>
> ***
>
> Perrigo's stock should be avoided, and the company looks like it is going down the same path Valeant went down this time last year.

> The Federal raid on Perrigo's offices suggests that the company's pricing power in the U.S market may come under threat, and its roll-up business model may be depending on pricing power.

Biotechnocrat, *Will Perrigo Collapse?*, Seeking Alpha (May 5, 2017),

https://seekingalpha.com/article/4069635-will-perrigo-collapse.

248.    All told, Perrigo's stock declined more than 62% from the start of the Relevant Period as Defendants' false and misleading statements about Perrigo came to light.

249.    On May 22, 2017, Perrigo filed its delinquent Form 10-K for calendar year 2016 and restated the financial statements previously filed on Form 10-Q for each of the first three quarters of 2016. Perrigo's delinquent 2016 Form 10-K conceded extensive material weaknesses in its financial reporting. With regard to the Tysabri royalty stream, the Company admitted:

> [M]anagement determined that its control over the review of the application of the accounting guidance in ASC 805 Business Combinations did not operate effectively in the appropriate identification of the assets acquired and liabilities assumed in connection with the Elan acquisition in December 2013. All originally filed financial statements presented up to the filing of this 2016 Form 10-K included the disclosure of the Elan acquisition with the Tysabri® royalty stream presented as an intangible asset. In addition, due to the fact that the asset was historically classified as an intangible asset, we did not design or implement controls around the fair value accounting for the Tysabri® royalty stream as a financial asset, so these controls were not in place at any quarter end subsequent to the acquisition, including the date of the annual assessment of internal control. Accordingly, management concluded that these control deficiencies represent material weaknesses.

250.    The delinquent 2016 Form 10-K and restated financial statements revealed that billions of dollars in Tysabri deterioration had been hidden from investors during the Relevant Period. As reflected in the below chart: (a) Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of June 27, 2015, was no more than $5.42 billion, and as of December 31, 2015, was no more than $5.31 billion;

(b) Perrigo's restated Form 10-Q for the first quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of April 2, 2016, was no more than $5.02 billion; (c) Perrigo's restated Form 10-Q for the second quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of July 2, 2016, was no more than $4.02 billion; (d) Perrigo's restated Form 10-Q for the third quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of July 2, 2016, was no more than $3.55 billion; and (e) Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of December 31, 2016, was no more than $2.35 billion.

| Measurement date | Last reported value for Tysabri royalty stream | Actual fair value according to Perrigo | Decline hidden from investors by false accounting |
|---|---|---|---|
| 6/27/2015 | $5.8 billion | $5.42 billion | $380 million |
| 12/31/2016 | $5.8 billion | $5.31 billion | $490 million |
| 4/2/2016 | $5.8 billion | $5.02 billion | $780 million |
| 7/2/2016 | $5.8 billion | $4.02 billion | $1.78 billion |
| 10/1/2016 | $5.8 billion | $3.55 billion | $2.25 billion |
| 12/31/2016 | $5.8 billion | $2.35 billion | $3.45 billion |

Sources: Form 10-Q filed April 29, 2015; Form 10-Q filed August 29, 2015; Form 10-KT filed February 22, 2016; Forms 10-K and 10-Q/A filed on May 22, 2017.

251.    On June 5, 2017, Perrigo issued a press release announcing the forthcoming retirement of John Hendrickson—who succeeded Defendant Papa as CEO of Perrigo—making Hendrickson the second top executive to leave the Company that year (after Defendant Brown).

252.    More recently, in April 2018, Bloomberg reported that prosecutors are close to bringing criminal charges against generic drug companies, including potentially Perrigo, explaining:

> U.S. prosecutors are nearing their first charges against companies in an almost four-year-old criminal investigation into alleged price-

fixing by generic-drug makers, according to people familiar with the matter.

At least two companies are on track to be indicted in the coming months, in addition to several executives, said two people, who spoke on condition of anonymity because the investigation is confidential. Another company could agree to plead guilty before then, said one. . . .

The charges, which the people said could be filed as soon as the summer, would mark a major breakthrough in an investigation that began in 2014 and has spread to nearly every major generic-drug manufacturer. . . .

\*\*\*

Federal authorities have raided at least two companies in the investigation. Perrigo Co. disclosed its offices were searched last year.

\*\*\*

The looming charges involve fixing prices and dividing up the market, according to one of the people. Although indictments are expected, the companies or their executives could agree to plead guilty rather than fight the charges, said the other person. The identities of the companies set to be charged couldn't be learned.[18]

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

253.   Numerous additional facts demonstrate that Defendants acted intentionally or, at minimum, were reckless, in making the material misstatements and omissions concerning the condition of Perrigo's business.

---

[18] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, Bloomberg.com (Apr. 24, 2018), https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe (last visited July 26, 2018).

A.     **Omega and Organic Growth**

1.     **Defendants' own statements regarding the integration and valuation of Omega and organic growth imply personal knowledge of the true conditions**

254.    Defendant Papa professed to have detailed knowledge of Omega's operations and performance, as well as personal knowledge of the factors that drove that performance—and repeatedly spoke on these subjects to investors. He repeatedly touted successful ongoing efforts to integrate Omega, as well as the contribution such integration would make to Perrigo's organic growth. For example, Papa stated during a June 2, 2015 presentation to investors that "Omega and Perrigo together were well-positioned," to achieve a "5% to 10% growth rate," and described the Omega acquisition as "immediately accretive." Similarly, on Perrigo's earnings call held on August 5, 2015, Defendant Papa assured investors that the Company had "delivered on our Omega integration plan" by, among other things, "achiev[ing] great operational efficiencies and productivity improvement." While making these statements, Papa also repeatedly reassured investors that he and his team were intimately familiar and hands-on with the ongoing integration process. For example, on May 18, 2015, in direct response to analysts' questions concerning the "negative and positive surprises that [ha]ve occurred since [the Omega acquisition]," Defendant Papa affirmatively represented that he "had a chance to work with the [integration] team," and discussed specific details of the ongoing integration, including identifying Omega products and channels that Perrigo had begun to utilize, and delving into the mechanics of the integration process.

255.    In light of these reassuring statements to the market on a topic of immense importance to investors poised to decide whether to tender their shares, it was incumbent on Defendant Papa to ensure he understood the true facts concerning the subject on which he spoke. Either he possessed the knowledge of the Omega integration that he claimed to have, in which

case he knew that his statements were false and misleading, or he lacked the knowledge he claimed to have, in which case his conduct was severely reckless.

256.     Along similar lines, as Perrigo itself repeatedly stressed, the Omega acquisition was Perrigo's most important business initiative during the Relevant Period, and Omega's post-acquisition performance and successful integration was a subject of intense market scrutiny and concern. As Defendant Brown noted on June 23, 2015, the importance of the acquisition was such that Perrigo's business shifted from predominantly domestic U.S. sales to become "55% US, 45% ex-US, primarily Europe." On the same day, Brown also explicitly linked the much touted "5%-10%" organic growth rate Perrigo to Omega's success, stating "[t]hat is the growth that . . . we see in our future from the combined Perrigo and Omega footprint." Thus, not only did the acquisition make Omega the second largest segment in Perrigo's business overnight, the Individual Defendants themselves admitted that Perrigo's strategic future and its projected organic growth lay in successfully integrating and running Omega. Moreover, given the importance of the acquisition to Perrigo's performance and the value of its stock, analysts were consistently focused on it both before and during the Relevant Period. The Defendants were keenly aware of this fact, and as discussed above, each of them professed to be deeply familiar with the ongoing integration process. *See, e.g.*, *supra* ¶¶152-53, 159, 161. The admitted importance of the Omega acquisition, and Omega's status as a core operation of Perrigo, strongly indicates that Defendants were aware of ongoing integration problems, or were severely reckless in not being aware.

257.     Defendants also indicated that Papa and Brown each had significant roles in overseeing the Omega integration, supporting an inference that they were aware of the true state of the integration and Omega's underperformance. For example, Defendant Papa stated on May

6, 2015, that "[w]hat we tried very hard to do is build a relationship with Mark [Coucke], the CEO founder of [Omega]. That relationship goes back to visiting him, him visiting us in Allegan, Michigan. . . . And we had some very good dialogs about how we can work together. We started some things even before this transaction occurred. So it was a long-time relationship building with Mark." Moreover, on June 5, 2015, Papa stated that ***I had to integrate the Omega organization."*** Similarly, Papa stated on February 5, 2015, that he and other senior Perrigo executives "[have] been working with the Omega team [including Coucke] on the post close integration, and we've had meetings with country managers, finance team, and our supply chain teams." Likewise, on June 23, 2015, in response to an analyst's questions, Defendant Brown reported that the Mylan offer had not impacted the integration efforts, and that "[the integration] team continues to do what their mission is and what they had been scheduled to do." Defendant Brown then gave a detailed discussion of Omega's manufacturing and supply chain capabilities, before stating that "Omega [is] more invigorated than ever by the combination of what we can do together. [The integration] team is doing their thing and ***I am off to Belgium next week.*** That [is] process like normal."

258.    Furthermore, Defendants Papa and Brown were the chief orchestrators of Perrigo's takeover defenses against Mylan and were responsible for making nearly all statements Perrigo issued to investors opposing Mylan's offer. In doing so, Defendants Papa and Brown demonstrated that they were intimately familiar with post-acquisition operational synergies and the complex obstacles involved in achieving them. Indeed, both commented extensively on the practical impediments to Mylan's synergy claims concerning Perrigo and personally and repeatedly discussed the practical details of integration with investors in an effort to thwart the Mylan acquisition. Perrigo's Board of Directors recognized the importance of Papa and Brown to

the anti-takeover efforts and granted them special cash and equity bonuses for their "key contributions related to Mylan's hostile takeover attempt."

259.    Defendants admitted understanding the difficulty of integrating a large acquisition and achieving merger synergies. In opposing Mylan's bid, they acknowledged the same impediments that plagued Perrigo's integration with Omega. For example, on September 17, 2015, Defendant Brown told investors not to tender to Mylan because "Mylan hasn't told you [that] there are potentially very material negative synergies in product divestments and supplier contracts with change of control provisions, which could put significant revenue at risk." Accordingly, Defendants either knew that similar problems could emerge in Omega, which they described to be Perrigo's number one "growth driver[] for 2016 and beyond," or were severely reckless in not learning.

260.    That Defendant Papa, Chairman of the Board, was actually aware of the true facts involving the ongoing integration efforts is amplified by the statements he made to investors under the Irish Takeover Rules. As discussed above, Rule 19.2 of the Takeover Rules required that those issuing public statements during a takeover take "all reasonable care to ensure [that] the information contained in the document or advertisement is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information." Pursuant to Rule 19.2, each presentation and press release Perrigo issued from the beginning of the Relevant Period through the end of Mylan's tender offer contained the written assurance that "[t]he *directors of Perrigo accept responsibility for the information contained in this announcement*," and that they "*who have taken all reasonable care to ensure* . . . the information contained in this announcement is in accordance with the facts." Thus, Papa, by his

own claim to have investigated the factual basis for his assertions, must be charged with knowledge of the true facts concealed from investors.

261.    Likewise, the Defendants cannot escape the inference that they were at least reckless when issuing profit forecasts. Irish Takeover Rule 28 mandates that "[e]very such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity."[19] That the relevant Defendants did not use scrupulous (or even moderate) care, accuracy and objectivity in compiling the profit forecasts they pitched to investors as a basis to reject the Mylan bid, and instead rolled up fanciful assumptions that the Company has since admitted were not "realistic" demonstrates a willingness to say or do anything to defeat Mylan's bid.

262.    Highlighting his personal knowledge of the promised standards he was breaching, Defendant Papa personally assured investors that he was familiar with and compliant with the Irish Takeover Rules. On May 6, 2015, he stated that "The Irish rules and Irish governance process is very clear . . . We have had regular communications with the Takeover Panel….and they've been very helpful to us. . . .So there's a good process. We understand it. We have been working very closely with the takeover panel to *make sure that we follow the rules*."

## 2.    Information supplied by former employees of Perrigo and Omega demonstrate Defendants' scienter

263.    As discussed above, according to information supplied by CW1, Christine Kincaid, and other former Perrigo and Omega employees to whom allegations in the Amended Securities Class Action Complaint and Carmignac Complaint are attributed, adverse information concerning Omega's acquisition, integration and poor performance was made available and

---

[19] *See* Irish Takeover Rules, *available at* http://irishtakeoverpanel.ie/wp-content/uploads/2014/01/ITP-Takeover-Rules.pdf.

accessible to senior Perrigo executives, including Defendants Papa and Brown. *See supra* ¶¶52-77, 81-85. Given the repeated representations that Papa and Brown communicated closely with the senior-most executives at Omega, and were personally involved in and oversaw the integration process, these facts demonstrate that Papa and Brown either knew that these cost synergies they were touting were unrealistic or were severely reckless in ignoring repeated warnings by employees of Omega and Perrigo that this was the case.[20]

### B.    Generic Pricing and Anti-competitive Conduct

264.    Defendants Papa and Brown both claimed to have personal knowledge of Perrigo's generic drug pricing strategy, the pricing environment of other manufacturers, and Perrigo's ability to withstand pricing pressures in the generic drug industry, and the Generic Rx segment was a core operation of Perrigo, indicating that they would have inescapably learned of the highly unusual, coordinated price hikes, and pricing pressures impacting (or reasonably likely to impact in the near future) Perrigo's Rx segment, alleged herein.

265.    Moreover, Papa and Brown had access to information concerning, among other things, the increased competition in the U.S. generic drug market and the FDA's ramped-up approval of generic drug applications. Indeed, these Defendants knew the immense regulatory scrutiny was aimed at driving down the price of generic drugs, which had reached unsustainable levels. At all relevant times, as alleged in the Carmignac Complaint (at ¶¶131-35, 205), Perrigo maintained a comprehensive list of competitor companies that had filed ANDAs with the FDA for products that would, if approved, compete with Perrigo's products, was also keenly focused on and monitored the FDA approval process, and thus was aware of when and how drugs would

---

[20] Defendants' deliberate unlawful, anti-competitive conduct—price fixing—alleged herein further supports an inference of scienter. *See, e.g.*, *infra* VIII.B.

hit the market. Papa and Brown and the other Defendants therefore had access to information concerning applications in the FDA pipeline for generic drugs that would, once approved, rival Perrigo's stable of generics. At a minimum, the Defendants were reckless in falsely stating the Company was "insulated" from negative pricing pressures and was keeping pricing "flat to up slightly" despite those pressures.

266. Additionally, Defendants, unlike investors, were aware of or recklessly disregarded the various sources of information pointing to unlawful activity undermining the accuracy of their statements. Defendants had access to reports and information, including industry data (*see e.g.*, *supra* ¶¶89-90), containing red flags indicating anti-competitive conduct was impacting the pricing of at least six generic compounds that generated millions of dollars in revenues during the Relevant Period. These red flags should have at least generated suspicion and investigation that the long-running anti-competitive conduct was possible. As red flags known or available to Defendants were indicative of anti-competitive conduct for the reasons set forth above, the fact that the DOJ was investigating Perrigo's participation in anti-competitive behavior should not—and would not—have taken Defendants by surprise. Despite these facts, Defendants described, and continued to describe, Perrigo's financial performance and prospects in glowing terms and concealed, and then continued to conceal, the Company's illegal conduct. But, given Perrigo's illegal antitrust scheme and Defendants' knowledge of the aforementioned facts, Defendants could not have genuinely believed that their statements were accurate and complete.

267. Moreover, the very nature of the price-fixing activities inflating the results of Perrigo's most profitable division supports an inference of scienter. The price-fixing at issue lasted for years and fundamentally transformed the revenues generated by some of Perrigo's

most important generic drugs. The successful execution of this scheme required systematic coordination and top-down command and control, which could not be done without the knowledge and approval of the Company's highest-ranking executives. Indeed, the significant corporate actions required to participate in any collusive behavior—including raising prices for key products to the same levels near-simultaneously with multiple competitors pursuant to a collusive agreement—could not have been accomplished by low level employees acting alone.

268.    On July 20, 2016, a mere three months after Defendant Papa's resignation, Perrigo announced a "leadership change" in its Generic Rx division. Specifically, Perrigo replaced the executive who was brought in to head the division just as the collusive price hikes commenced, Douglas Boothe. Further, Boothe's departure occurred shortly—only two months— before private antitrust litigation relating to Perrigo's Generic Rx division was brought against Perrigo. These facts further contribute to the strong inference that senior executives of Perrigo were personally aware of, or recklessly ignored, price fixing in Perrigo's Generic Rx segment.

### C.     Tysabri

269.    Defendants' GAAP violations alleged above concealed ***billions*** of dollars of declines in the value of Perrigo's largest financial asset and demonstrate scienter. The correct accounting treatment for the Tysabri royalty stream was clear and easy to apply. The Company itself and its then-CEO described the royalty stream as a "financial asset" in May 2016, approximately a year before restating results, and Perrigo now concedes that GAAP calls for financial assets to be recorded at their fair market value. Moreover, the $3.6 billion difference between the market price for the Tysabri royalty, as reflected in its sales price of just $2.2 billion

(before ***contingent*** payments of up to $650 million),[21] and the $5.8 billion value Defendants

claimed during the Relevant Period, strongly supports an inference that at least Perrigo, Papa and

Brown knew that the Tysabri asset was worth far less than reported to investors.

       **D.**     **Further Allegations of Scienter**

       **1.**     **Findings by the Irish Takeover Panel**

    270.    That the Irish Takeover Panel repeatedly found Perrigo's actions to be misleading

during the Mylan offer period bolsters an inference that it understood its aggressive statements

risked misleading investors. The Irish Takeover Panel—the government body charged with

enforcing and adjudicating disputes under the Takeover Rules—twice ruled that Perrigo

breached rule 19.3, "Avoidance of Misleading Statements," by making materially misleading

statements in resisting the tender offer. The Panel's August 25, 2015 ruling covered a series of

Perrigo's statements concerning the tender offer and stated in no uncertain terms that the voided

"statements may ***mislead shareholders and the market*** or may create uncertainty contrary to

Rule 19.3(a) of the . . . Takeover Rules."[22] Similarly, in October 2015, the Panel ruled that

statements Perrigo made about Mylan's largest shareholder "may be misleading and therefore in

breach of Rule 19.3," directing Perrigo to make a corrective statement.[23] If Defendants' personal

admissions of responsibility and diligence were insufficient, the Takeover Panel's direct

criticism of Perrigo's public statements should have further put Defendants on notice as to their

---

[21] The fact that Defendants were readying the royalty stream for sale in the second half of 2016 provides a motive for Perrigo to claim an inflated fair value, so as to not dissuade potential buyers.

[22] *See* Press release concerning ruling, *available at* https://www.sec.gov/Archives/edgar/data/1585364/000119312515301798/d76981d425.htm

[23] *See* Press release concerning ruling, *available at* https://www.sec.gov/Archives/edgar/data/1585364/000158536415000145/a1009201514-d9aattachment.htm

responsibility to make accurate, factually substantiated statements under Irish law. That a neutral observer found Defendants to be misleading in certain aspects of their takeover defense further demonstrates their propensity to be misleading in the takeover defense statements and omissions alleged above in Section V.

### 2. The sheer size of Defendants' misrepresentations and the GAAP violations

271.     The Omega misrepresentations covered up problems so large they led to "total impairments of $2.0 billion"—43% of the entire Omega purchase value, 66% of the equity Perrigo contributed to the acquisition, *and **1.28 times*** the total goodwill Perrigo attributed to the Omega acquisition as of June 27, 2015. The organic growth misrepresentations hid that a decade of rapid organic growth had slowed to only around 1%, and the overstated earnings guidance had to be slashed numerous times. The concealed generic drug price-fixing involved hundreds of millions of dollars of unsustainable collusive revenue in Perrigo's most profitable division. Moreover, as alleged above, Defendants' GAAP violations concealed ***billions*** of dollars of declines in the value of Perrigo's largest financial asset and led to one of the largest restatements in recent history.

### 3. The close proximity, and sharp divergence, between the misrepresentations and revelations of the truth

272.     The temporal proximity between Defendants' false reassurances to investors and contradictory revelations supports a strong inference of scienter. Only months after issuing a supposedly "scrupulous[ly]" objective profit forecast, and less than only five weeks after reiterating guidance in January 2016, Defendants began to slash that guidance. Similarly, only five weeks after Papa's January 2016 reassurances concerning "synergies" with Omega, Perrigo announced the first of many large impairments related to Omega. Then, Papa resigned less than six months after urging investors to keep Perrigo an independent Company under his leadership,

which analysts and market commentators recognized raised concern about Defendants' prior representations (*see, e.g.*, ¶231). Such confident assurances followed quickly by contradictory revelations contribute to an inference of scienter.

273.   The sharpness of the divergences between reassurances made during the Relevant Period and subsequent revelations, involving multiple instances in which later negative disclosures completely contradicted Defendants' earlier positive statements, contributes to a strong inference of scienter. For example, Defendant Papa repeatedly trumpeted Perrigo's "strong history of responsible corporate governance" and "commitment to corporate governance and transparency," which purportedly stood in sharp contrast to "Mylan's irresponsible corporate governance behavior," which Defendant Papa called "abysmal." But shortly after making these forceful statements, Defendant Papa quit the Company, and the new CEO conceded that Perrigo's guidance to investors had not been "realistic." As discussed above, Defendants' repeated boasting concerning the value and success of the Omega acquisition were also contradicted soon after their positive statements by write downs that ***exceeded*** the total value of goodwill Perrigo had recorded in the acquisition. These shocking announcements were then followed by a raft of further executive personnel departures (including that of the CFO and the head of Perrigo's Generic Rx segment) over the course of 2016 and 2017, as well as a restatement. Such sharp contradictions, including a complete reversal from touting synergies to the need to implement major, multi- hundred-million-dollar "restructuring[s]" in the span of weeks, contributes to a strong inference of scienter, or at the very least, severe recklessness.

### 4.   Sarbanes-Oxley Certifications

274.   In their Certifications Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, submitted with the Company's 2015 Form 10-K and Form 10-KT, Defendants Papa and Brown represented that (i) they had reviewed the Company's respective filings; (ii) the

reports did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (iii) the "information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]." Perrigo's admission that it actually had "material weaknesses" in internal controls, specifically that it "did not maintain, in all material respects, effective internal control over financial reporting [throughout the Relevant Period]," suggests that either Papa and Brown were reckless in making their Sarbanes-Oxley certifications, or had actual knowledge of the deficiencies from the investigation they claimed to have conducted.

### 5.      Timing and circumstances of executive departures

275.     The timing and circumstances of Defendant Brown's departure also demonstrates her (and Perrigo's) scienter. It came the same day that Perrigo announced it was investigating "historical revenue recognition practices" regarding the Tysabri royalty stream, and that it could only sell the Tysabri royalty stream for $2.2 billion (or up to $2.85 billion if certain milestones were satisfied), *billions less than the value Brown had caused Perrigo to report to investors* using an accounting scheme that Perrigo now admits violated GAAP, and which directly furthered Defendants' fraud. As discussed above, Defendants' scienter is also demonstrated by the timing and circumstances of the departures of Papa, Coucke, and Boothe, which are alleged above. *See, e.g.*, ¶¶13, 20, 232, 237, 268.

### 6.      Defendants' Motives

276.     As alleged in detail above—and as numerous independent observers, such as Jim Cramer, Wells Fargo and Starboard Value concluded after the tender offer failed (as noted above)—Defendants' motive during the takeover period was to derail Mylan's bid and cause investors to reject the deal. Papa and Brown were awarded millions of dollars in special bonuses for their roles in defeating the Mylan offer (*see supra* ¶133). Further, the Individual Defendants

were motived to engage in fraud for personal entrenchment reasons—to prevent a transaction likely to lead to their terminations.

## VIII.  RELIANCE

277.   During the Relevant Period, Plaintiffs reasonably relied on the materially false and misleading statements and omissions alleged herein in reaching investment decisions concerning Perrigo common stock.

278.   There is a presumption of reliance established by the fraud-on-the-market doctrine because, among other things:

(a)   The Defendants made public misrepresentations or failed to disclose material facts during the relevant period;

(b)   The misrepresentations and omissions were material;

(c)   The Company's securities traded in efficient markets;

(d)   The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's securities; and

(e)   Plaintiffs purchased Perrigo securities between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

279.   At all relevant times, the market for Perrigo's securities was efficient for the following reasons, among others:

(a)   Perrigo's common stock met the requirements for listing, was liquid, and was listed and actively traded on the NYSE and TASE, highly efficient and automated markets;

(b)   As a regulated issuer, Perrigo filed periodic reports with the SEC and the New York Stock Exchange;

- 131 -

(c)      Perrigo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Perrigo was covered by multiple analysts during the relevant period.

280.   As a result of the foregoing, the market for Perrigo's securities promptly digested current information regarding Perrigo from all publicly available sources and reflected such information in the price of Perrigo securities. Under these circumstances, a presumption of reliance applies.

281.   Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

282.   In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding to purchase Perrigo securities and/or hold Perrigo securities through the tender offer.

283.   During the Relevant Period, the Plaintiffs' investments were managed by their investment adviser, Westchester Capital, which employed an active strategy based on an analytical, research-based investment process. Under this process, Westchester Capital made all decisions concerning whether to purchase, sell, tender, or hold shares for Plaintiffs. The Investment Manager regularly evaluated individual companies, including Perrigo, and were responsible for determining, on behalf of the Plaintiffs, whether to purchase, sell, tender, or hold

shares in those companies. Factors considered by Westchester Capital in deciding whether to purchase, sell, tender, or hold Perrigo shares included, among other things, Perrigo's financial performance and outlook, and a review of the Company's strengths, weaknesses and opportunities. Westchester Capital, in turn, relied on this as an important factor in deciding whether to purchase, sell, tender, or hold Perrigo shares.

284.   During the Relevant Period, Westchester Capital undertook comprehensive asset valuation analyses and performed rigorous independent and fundamental research including reading and relying upon publicly available information concerning Perrigo from the following sources: (a) Perrigo's public statements, plans and press releases; (b) Perrigo's corporate website and materials posted thereon; (c) analyst reports and earnings conference calls involving Perrigo; (d) Perrigo's periodic securities filings with the SEC and the NYSE, including its Forms 10-K; (e) other regulatory filings and reports regarding Perrigo; and (f) industry conferences and conference transcripts involving Perrigo.

285.   In particular, Westchester Capital read, reviewed, and/or listened to, and relied on statements from the foregoing sources set forth in Section V above concerning the Company's financial performance and outlook, Mylan's tender offer, and audited financial statements, particularly those regarding Perrigo's financial condition, the Omega acquisition, Omega's performance and integration, Perrigo's organic growth, pricing in the Generic Rx division, and the fair value of the Tysabri royalty stream and GAAP compliance. The Investment Manager used the Company's reported revenues and projections, among other things, as metrics to analyze Perrigo's current and future operations and financial performance and the relative value of Mylan's tender offer, and in making decisions about whether to invest in Perrigo or its competitors. In so doing, the Investment Manager also read and relied on statements from these

sources relating to Perrigo's financial condition, the Omega acquisition, Omega's performance and integration, Perrigo's organic growth, pricing in the Generic Rx division, the fair value of the Tysabri royalty stream, and GAAP compliance.

286.     In deciding to purchase or acquire Perrigo common stock and in making investment decisions concerning Perrigo common stock during the Relevant Period, Plaintiffs, through their investment adviser Westchester Capital, read, reviewed, and/or listened to, and relied on Defendants' false or misleading statements set forth in Section V above (to the extent the statement was released to the market) as being materially complete and as not omitting material information, including information regarding Perrigo's financial condition, the Omega acquisition, Omega's performance and integration, Perrigo's organic growth, pricing in the Generic Rx division, and the fair value of the Tysabri royalty stream and GAAP compliance. In reliance upon the false or misleading statements and omissions identified above in Section V, Plaintiffs purchased or acquired Perrigo common stock during the Relevant Period—including purchasing a total of approximately 156,000 shares of Perrigo common stock during the Relevant Period that were held on the tender offer deadline (*see supra* ¶33) (some of which were held through the February 18, 2016 corrective disclosure alleged above)—and as a result, were damaged by the fraud detailed herein.

287.     Defendants' false and misleading statements and omissions of fact alleged herein had a material influence and were a substantial factor in bringing about Plaintiffs' investment adviser's investment decisions with respect to Perrigo stock. Plaintiffs' investment adviser, Westchester Capital, did not know, and in the exercise of reasonable diligence could not have known, of Defendants' false and misleading statements alleged herein when reaching investment decisions concerning Perrigo common stock during the Relevant Period.

## IX.    NO SAFE HARBOR

288.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Perrigo who knew that those statements were false when made.

## COUNT  I
### For Violations of Section 10(b) of the Exchange Act
### (Against All Defendants)

289.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

290.    During the Relevant Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff, as alleged herein; and (ii) cause Plaintiffs to purchase Perrigo common stock at artificially inflated prices.

291.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Perrigo common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

292.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

293.    During the Relevant Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

294.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Perrigo's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

295.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Perrigo common stock. Plaintiffs would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Perrigo common stock had been artificially inflated by Defendants' fraudulent course of conduct.

296.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of the Company's common stock during the Relevant Period.

297.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT  II**
**For Violations of Section 14(e) of the Exchange Act**
**(Against All Defendants)**

298.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

299.     Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

300.     Defendants' conduct violated their respective obligations under Section 14(e) because Defendants made the materially false or misleading statements or omissions of material fact set forth above in connection with Mylan's tender offer.

301.     Those misstatements and omissions were material, in that a reasonable investor would have deemed those facts important in determining whether to purchase and tender its shares of Perrigo stock in connection with the tender offer.

302.     Defendants intentionally or recklessly engaged in acts, practices, and a course of conduct that was fraudulent, deceptive or manipulative when issuing their false or misleading statements or omissions of material in violation of Section 14(e) of the Exchange Act. During the Relevant Period, and while in possession of material adverse, nonpublic information, Defendants

used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make the materially false or misleading statements and omissions of material fact alleged herein to: (i) knowingly or recklessly deceive Perrigo shareholders with respect to Perrigo's operations, business, performance and prospects; (ii) cause the market price of Perrigo common stock to trade above its true value; and (iii) induce a majority of Perrigo shareholders to reject Mylan's Tender Offer, thereby interfering with the Plaintiffs' opportunity, and depriving them of the opportunity, to tender their Perrigo common stock in exchange for the combination of cash and Mylan stock offered by Mylan through the tender offer.

303.    As a direct and proximate result of Defendants' wrongful conduct, the Plaintiffs suffered damages in connection with their holdings of Perrigo common stock as of the expiration of Mylan's Tender Offer on November 13, 2015 because the tender offer, which was in large part defeated as the result of Defendants' material misrepresentations and omissions, would have provided the Plaintiffs with substantially more value than holding their Perrigo common stock.

304.    As a direct and proximate result of Defendants' violations of Section 14(e) of the Exchange Act, Plaintiffs were prevented from fairly assessing Mylan's offer, and were deprived of the opportunity to exchange their Perrigo shares for superior compensation in cash and stock. As a result, Plaintiffs incurred significant damages.

305.    By reason of such conduct, Defendants are liable pursuant to Section 14(e) of the Exchange Act.

**COUNT  III**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Papa and Brown)**

306.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

307.    Defendant Papa was the CEO and Chairman of the Board of Perrigo, and architect of the strategic positions taken by Perrigo alleged herein. He was directly involved in the day-to-day management of the Company, including its communications to investors. As a result, he had the power and ability to control the actions of Perrigo, and acted as a controlling person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo until his resignation, and is liable for Perrigo's violations of the Exchange Act during that time.

308.    Defendant Brown was the CFO of Perrigo, signed periodic filings on behalf of Perrigo, and certified those filings pursuant to Sarbanes-Oxley. As a result, Brown exercised control over Perrigo's selection of accounting treatment, the recording of its financial statements, and its decisions to comply or not comply with GAAP. By reason of such conduct, Brown was a control person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo regarding its accounting for the Tysabri royalty stream, and is liable for Perrigo's violations of the Exchange Act related thereto.

309.    Papa and Brown were the CEO and the CFO of Perrigo, respectively, and were privy to, and monitored, confidential and proprietary information concerning Perrigo, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations. In these roles, the Individual Defendants had regular access to non-public information about Perrigo's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

310.     Each of the Individual Defendants was a controlling person of Perrigo within the meaning of Section 20(a), as alleged herein. By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, Papa and Brown each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company including the content and dissemination of the statements Plaintiffs allege were materially false or misleading and/or omitted material facts.

311.     Papa and Brown were provided with, or had access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of the statements or cause the statements to be corrected. In particular, Papa and Brown maintained direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

312.     As set forth above, Defendants violated Sections 10(b) and 14(e) of the Exchange Act by their acts and omissions as alleged herein. By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Sections 10(b) and 14(e) of the Exchange Act and Rule 10b-5, Papa and Brown are liable pursuant to Section 20(a). As a direct and proximate result of Papa's and Brown's culpable conduct, the Plaintiffs suffered damages in connection with their purchases of the Company's stock during

the Relevant Period and holdings of Perrigo common stock as of the expiration of Mylan's

Tender Offer on November 13, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Awarding compensatory damages in favor of Plaintiffs against all Defendants,

jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an

amount to be proven at trial, including interest thereon;

B.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

including attorneys' fees and expert fees; and

C.     Awarding such equitable/injunctive or other further relief as the Court may deem

just and proper.

## JURY DEMAND

Plaintiffs herby demand a trial by jury.

Dated: November 15, 2018                    Respectfully submitted,

**WHIPPLE AZZARELLO, LLC**          **LABATON SUCHAROW LLP**

s/ John A. Azzarello                         s/ Serena P. Hallowell
John A. Azzarello                            Serena P. Hallowell (*pro hac vice* forthcoming)
WHIPPLE AZZARELLO, LLC                       David J. Schwartz (*pro hac vice* forthcoming)
161 Madison Avenue                           Corban S. Rhodes (*pro hac vice* forthcoming)
Suite 325                                    Eric D. Gottlieb (*pro hac vice* forthcoming)
Morristown, NJ 07960                         140 Broadway
Tel: (973) 267-7300                          New York, NY 10005
Fax: (973) 267-0031                          Tel: (212) 907-0700
azzarello@whippleazzarellolaw.com            Fax: (212) 818-0477
                                             shallowell@labaton.com
                                             dschwartz@labaton.com
                                             crhodes@labaton.com
                                             egottlieb@labaton.com

*Local Counsel for Plaintiffs*               *Counsel for Plaintiffs*